(No. 16762.—Reversed and remanded.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LOUIS BERARDI, Plaintiff in Error.

*Opinion filed April 23, 1926.*

1. CRIMINAL LAW—*police are not authorized to keep parties in solitary confinement for the purpose of questioning.* Police are not authorized to keep parties charged with crime in solitary confinement for several days, without counsel or other advisers, for the purpose of continually questioning them.

2. SAME—*when revolver should not be admitted in evidence.* A revolver found in the rooming house where the defendant was arrested on a charge of robbery with a gun should not be admitted in evidence against him where it is not shown that the gun belonged to him or that it was at the scene of the robbery.

3. SAME—*defendant is entitled to a preliminary hearing as to alleged confession:* Where the defendant, or his counsel for him, makes the claim to the court that he has been maltreated and that an alleged confession offered in evidence was extorted from him and asks for a preliminary hearing on the question, it is the duty of the court at once, out of the hearing of the jury, to hear evidence on the question as to whether the confession was voluntary.

4. SAME—*conduct of court should not indicate hostile attitude toward defendant.* The remarks and conduct of the court in the progress of the trial should not indicate a hostile attitude toward the defendant as the jury are ever watchful of the attitude of the court, and where the trial judge so conducts himself by his rulings, his remarks, his interruptions of counsel for the defendant and by his general attitude and language as to indicate a hostile attitude, a conviction may be reversed on the ground that the defendant has not had a fair trial.

STONE and DEYOUNG, JJ., specially concurring.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. WILLIAM N. GEMMILL, Judge, presiding.

HERMAN JACOBS, (ELWYN E. LONG, of counsel,) for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and JAMES B. SEARCY, (HENRY T. CHACE, JR., and EDWARD E. WILSON, of counsel,) for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Louis Berardi was jointly indicted in the criminal court of Cook county with Margaret Byrnes and Mike Sberna for the robbery of Herman Schlachet, all of them being then and there armed with a pistol. Berardi was tried separately and found guilty of the crime as charged and sentenced to the penitentiary. He has sued out this writ of error to review the record.

On the evening of June 17, 1924, about 10:15, the drug store of Herman Schlachet, located at the northeast corner of the intersection of Lotus and Madison streets, in Chicago, was entered by three robbers. At the time of the robbery there were present in the drug store, Erickson, registered pharmacist, Samuel Block, pharmacy apprentice, R. E. Ogden, book-keeper, and Herman Schlachet, the proprietor. Schlachet, Erickson and Ogden were in the rear of the store in a place referred to as the office, just preceding the robbery. Schlachet and Erickson were checking bills. Block was near the rear and was engaged with a number of people, and Erickson was busy at the prescription table. The drug store is described as 5430 West Madison street, which street runs east and west, the store being on the north side of the street, facing south. Lotus street runs north and south, and the drug store is on the east side of Lotus street and is twenty or thirty feet wide. On said

date Mike Sberna, and another man who was never caught or identified and referred to as Battaglio, entered the drug store at the Lotus street entrance, and while armed with revolvers ordered Block to go into the prescription room with Erickson, Ogden and Schlachet and made all of them stand up against the wall, at first facing the robbers and holding up their hands, and after about two minutes all of them were ordered to face the wall. The two robbers then went through their pockets and removed therefrom whatever articles of value they wanted. They took from the pocket of Block a pocket-book containing a receipt for an insurance premium, which was later recovered from Sberna after he was captured, and Sberna was identified by Block and Schlachet. Sberna also took from the pocket of Ogden a Masonic charm, which was afterwards recovered, and Ogden also identified Sberna as one of the robbers, who on that night wore a light-colored silk shirt with blue stripes in it. There seems to be no question about Sberna being one of the robbers, but he made his escape after his arrest and has not been since apprehended. While Sberna and Battaglio were going through the pockets of Block and the two other employees and Schlachet, a third robber came to the place where the other two were robbing the occupants of the drug store and said to the two robbers, "Get one of the guys; I can't open the register." Schlachet volunteered to go with him and followed this third robber, whom he identified as the defendant Berardi, to one of the cash registers at the front part of the drug store, and Battaglio followed behind Schlachet, the three going to the cash register. Schlachet reached the cash register with the man that he identified as the defendant on his left and Battaglio on his right with a gun in his hands, and who was holding the gun to Schlachet's ribs, according to Schlachet's testimony. Schlachet attempted to open the cash register, but it appears that because of his excited condition he was unable to work the combination and did not succeed in doing so, but he

321-4

finally pulled open a bottom drawer in the register which was not locked and which contained stamps and about ten or twenty dollars in money. One of these two robbers grabbed this money and put it in his pocket, as testified to by Schlachet, but he was not able to tell which one of the two took the money. None of the witnesses from the drug store ever saw or claimed to see the woman, Margaret Byrnes, in the drug store or about the premises thereof that night, but it appears that she was also arrested and indicted as one of the robbers but afterwards made her escape, she and Sberna having given bail and afterwards defaulted, as we understand the record. The two robbers Sberna and Battaglio also took from the pockets of Schlachet some silver and a paper with pen and ink markings, and a blue envelope containing the address of Fordman, 27 Farley avenue, Newark, New Jersey, which was addressed to Mr. Schlachet. This paper and envelope was afterwards recovered, presumably from Sberna, as Schlachet stated in his evidence that either Sberna or Battaglio took it from him, and Battaglio was never arrested or apprehended. Schlachet described the revolver that Sberna had on that night as a short, pearl-handled revolver, a little rusty, and he also identified a gun exhibited in evidence as the gun of Sberna. He described the revolver of Battaglio as a nickel-plated revolver.

The only witness to positively identify the defendant Berardi as one of the robbers of the drug store is the proprietor, Herman Schlachet. None of the witnesses from the drug store saw any revolver on or about the third robber, identified as the defendant. The only other evidence tending to show the guilt of Berardi is an alleged confession testified to by two of the police force of Chicago who had him in custody, and some circumstances concerning his knowledge and association with Mike Sberna, who was well proven to be one of the robbers, and Battaglio, who is said to be one of the three robbers but who was never identified

as one of the robbers by any of the eye-witnesses to the robbery, and it does not appear that they were really acquainted with Battaglio before the robbery. The only evidence in the record that Margaret Byrnes and Battaglio took part in the robbery or were in any way connected with it is the alleged confession of the defendant to the police, which is hereinafter recited. The evidence of a number of the witnesses is to the effect that the night in question was a dark, rainy night, and this accounts for the fact that Schlachet was not able to identify anyone in the car into which he pursued Battaglio. The circumstances under which Schlachet claims that he was able to and could positively identify the defendant are especially important in this case.

In addition to the circumstances and the connection and conduct of Schlachet with the defendant as testified to by Schlachet and already above recited, Schlachet further testified: As he stood at the cash register when they first got to it with Berardi, Berardi did not at that time have his hands up to his face but that they were down against him (witness indicating). He stated that he looked at Berardi at that time, and "I now say that Louis Berardi was the man that stood alongside of me." He stated that when they got the money out of the cash register drawer he then went from that register to another cash register that he had there. Then the two robbers said, "Is there any money in the other cash register?" The witness was then about a foot from the cash register and Berardi was about eight inches from a certain door, the position of which is not indicated in the record or its distance from Schlachet. This part of the testimony is rendered unintelligible, in the main, by reason of the attorneys simply allowing the witness to point to a certain plat of the premises and indicate places by the words "here" and "there." He stated that while the defendant was at the door Berardi said, "Shoot! Shoot!" He looked then to see what he (Battaglio) was going to do; that Battaglio pulled the trigger once and then pulled it again.

When witness heard the clicking of the trigger Battaglio was about ten or twelve feet away. When witness realized that the gun did not fire after being twice snapped he immediately jumped at Battaglio's head, and when he realized that Battaglio was getting the best of him he grabbed a chair and went after Battaglio with the chair and fought him with it and ran him out of the front door. When he got outside with the chair he shouted for help and for the police, and he finally got hold of Battaglio by the coat while he was standing on the running-board of a car that was standing there on Lotus street and then got him by the throat, and Battaglio fired the gun at him, and the bullet just grazed the witness on his left temple. He stated that it was rather dark there and that he could not tell who was in the machine. He heard other firing from near the corner on Madison street and got behind a tree and finally went in his drug store, told his men that he was shot and Erickson dressed his wound. He did not see any more of Berardi after he began his fight with Battaglio, and he did not see Sberna come out of his drug store when Sberna left it. He stated on cross-examination that he was quite excited while he was trying to open his cash register drawer and that he could not open it. He again testified that when he was standing at the cash register that Berardi was on his left and they were facing the same way. He further stated that he first saw Berardi in the rear of the store and while he was facing the wall, and that he looked around and saw Berardi with his hand over his face (indicating). He further stated that when the police came in there after the robbery there was quite a bit of excitement and that he did not remember what he told the police at that time. A day or so after the robbery "the police called me and said they had a man down there and I should go down there and identify him. I went to the Austin avenue police station. If my memory is correct, about five men were shown to me at one time. Out of that group I saw a man who

looked to be the man who had been in my store. I saw
Sberna." He next saw the defendant about a week later,
when he was called to the Austin avenue police station, and
there he saw the defendant Louis Berardi, in company, he
thinks, with one more person, and said, "That is the fel-
low." This is the sum and substance of his evidence as
to his opportunity to identify the defendant and the circum-
stances under which he identified him.

Block testified to the excited condition of Schlachet at
the time the robbery was in process and stated that when
the third robber came back and asked for someone to open
the cash register Schlachet was facing the outlaws, and
"Schlachet was doing a number of convulsions at that time;
he seemed to be unable to hold still." The witness remained
in the rear part of the drug store in his position with his
face to the wall during the time that Schlachet was at the
cash register and was struggling with Battaglio. He was
called down to the police station to identify Berardi a few
days later and could not identify him positively as one of
the robbers, and stated again that he was not able to posi-
tively identify Berardi as one of the robbers. He looked
at Berardi at the time he was calling for assistance to open
the cash register, and stated that Berardi had his hands over
his face in such a manner that he could only see a small
portion of his face. After making it clear that he could not
identify Berardi as one of the robbers he was asked by the
State to point out Berardi in the court room, and over the
objections of the defendant he did then and there point him
out, and then further stated, on cross-examination, that he
found out that it was Louis Berardi in the court when the
case came up and Berardi was referred to by that name.
He described the third robber in the drug store as a young
man about five feet three or four inches tall, who had on
a real dark suit of clothes and a cap, and that he was in a
crouched position, with his hands over his face, when he
saw him. He then again stated, "I could tell very decid-

edly whether he was young or old," and that he seemed to
be quite youthful.

One Edward Olmstead testified for the People that on
the night in question he was driving his Durant touring car
by the corner of Parkside and Washington boulevard, with
his wife and baby occupying the back seat, and noticed that
there was some excitement there and slackened his speed.
Sberna jumped on the running-board of his car, opened the
door and sat down by the witness and ordered him to "step
on it or I'll shoot you." He drove a couple of blocks to
Fifty-second and Washington boulevard, and the flivver
squad and a policeman ordered him to stop. The police
took Sberna into custody. Sberna threw away his pistol
before the police stopped the car. He described Sberna as
wearing a striped silk shirt and with no coat on at that time.

Robert S. Fallon and Thomas F. Carroll, two police offi-
cers of Chicago stationed at the Austin avenue police sta-
tion, testified for the People that on that night between 10 :00
and 10 :30 they were near the Schlachet drug store, walking
west on Madison street, and heard the cries of Schlachet,
"Robber! Hold-up! Police! Help!" He saw Schlachet
with a chair drawn, chasing another man. They saw the
man being chased by Schlachet. While at a distance of
about fifteen or twenty feet from the machine Fallon emp-
tied his revolver at the parties in the machine, firing six
shots into it as it drove away. Carroll fired all the shots
from his revolver except one at the parties in the machine.
They saw Sberna as he fled from the drug store fire two
shots at Carroll before he passed him and one at Fallon,
and the officers followed him down the street and saw him
throw off his overcoat and jump onto the running-board
of Olmstead's automobile. The flivver squad of the police
then followed Sberna in the machine and arrested him and
took him off of the car. These two officers secured a de-
scription from Schlachet of the other two men implicated
in the robbery, from which they concluded that the defend-

ant was one of the robbers, and they went to his home, where he had been living with his father and mother, about two o'clock the next morning to arrest him but failed to find him there. They later arrested him at Margaret Byrnes' home, where he had been rooming with her, and also arrested her and searched her trunk and found a revolver, which was introduced in evidence without any proof that it was the defendant's gun and which the defendant testified that he knew nothing about. It was not even proved to be in the hands of any one of the alleged robbers on the night of the robbery. They testified as to the identification of the defendant by Schlachet at the police station, and stated that after questioning the defendant for considerable time he at first denied all knowledge of the robbery but that he finally confessed to them that he was a party to it, and that he also stated to them that Frank Battaglio and Sberna were the other two robbers and that Margaret Byrnes was also there. They also testified that the defendant said that the machine or automobile that they used in driving to and away from the scene of the robbery was his brother's automobile, and that it was a Hudson automobile. They admitted that after they arrested the defendant they questioned him, and continued to question him after he had told them he knew nothing about the robbery, and that he was without counsel or anyone to advise him while he was in their custody and before his confession, and stated that they did not beat or strike him with anything or compel him to make his confession.

The defendant testified in his own behalf and positively denied that he was in the vicinity of the drug store on the night of the robbery, and denied that he in any way aided, abetted or assisted Sberna, Margaret Byrnes and Battaglio in the robbery of the store or had anything to do with it. He also testified that he was on that night at a party given in honor of his niece at his brother-in-law's house and remained there from 6:30 in the evening and until the next

morning, and that he slept there that night at his brother-in-law's. He further testified to his arrest and imprisonment in the police station by the police officers and to their questioning him day after day for three or four days, and that he continually, through all this questioning to the last, denied any and all connection with the robbery or knowledge of it. He also testified that officer Carroll, after they had questioned him for considerable time, brought a strap into the room where he was confined and beat him with the strap, and that another policeman whom he did not know questioned him about the robbery and kicked him on the shin; that his mother and father were allowed to see him at the police station and that he showed them his body, which was then black and blue from the beatings given him by the officers. He stated that he rented the room from Margaret Byrnes for himself and a boy friend and that that was his first acquaintance with her; that he saw a sign on her apartment, "Rooms for rent," and that that was his reason for going there for a room; that he went there after he had heard that the officers were looking for him on the night of the robbery, and that the officers had been in the habit of arresting him and bothering him before, and that he wanted to get away so that they would let him alone.

Thirteen witnesses, all of whom were guests at the party in honor of the defendant's niece at his brother-in-law's home on the night of the robbery, testified for plaintiff in error. All these witnesses stated in their testimony that they went to the party at seven o'clock in the evening, or earlier, and remained there from the time they got to the party until twelve o'clock, or later, that night; that plaintiff in error was there during the time that they were there and that they saw him there frequently and continually during the time that they were there and that he did not leave the place that night. One of these witnesses was the defendant's mother; two of them were his brothers; one of them his brother-in-law; one a brother of his brother-in-

law; three others were very distantly related and five of them in no way related to him. The testimony of these witnesses confirmed the defendant's testimony in every particular as to his whereabouts on that night, and these witnesses, including the defendant, estimated the number of guests there that night at from thirty to fifty, including the children of the guests.

The defendant testified in his examination that he did not occupy the same room at Margaret Byrnes' flat that she did. Officer Fallon was allowed to testify in rebuttal that they found a coat and cap in Margaret Byrnes' flat in her room at the time she was arrested, and which the defendant testified on his cross-examination did not belong to him and which he stated at the police station did not belong to him. During examination of defendant he was required by the court to put on the coat and cap in the presence of the jury.

If the thirteen witnesses for the defendant are to be given any credit in their testimony for truthfulness the alibi for the defendant was made complete by their evidence. In fact, unless these witnesses committed perjury the defendant was not at the scene of the robbery and could not have been. The testimony of Schlachet, while very positive, is nevertheless weakened by his inability, by reason of his extremely excited condition on that night, to remember any event with certainty that occurred that night. He could not tell which one of the robbers took his money out of the drawer after he opened it. He could not remember what he said to the officers when they came. He never knew the defendant before that night, and yet he was willing to state positively that the defendant was one of the robbers, although he had but one look at the defendant that night so far as his evidence shows, and then the defendant was looking in the same direction that Schlachet was when he was facing his register. We think that the police's suggestions on the night of the robbery, and before Schlachet identified the defendant, had considerable to do with his

identifying the defendant, from his evidence in this record. There was certainly a persistence manifested on the part of the two policemen to have the defendant identified and convicted as one of the robbers. Their testimony is more or less discredited by the fact that they admit they had the defendant in custody for two or three days, continuously questioning him when he was without counsel or other advisers. The police officers have no such privileges as they took with the defendant. The two policemen who testified to his confession themselves admit that the statements that they say he made to them as a confession were in part untrue. These untrue statements were, that he was with the robbers that night and that they went to the place of the robbery and away from the robbery in his brother's Hudson car. These officers examined his brother's car, and they had no question in their mind, after examining it, that that car was never in the robbery. The record evidence therefore is in such a condition of doubt and uncertainty as to require correct rulings by the court on the admissibility of evidence and conduct on the part of the court that would not be prejudicial to the defendant's interests. This character of treatment the defendant did not receive at the hands of the court. The court erred in many of its rulings against the defendant. We shall not undertake to note all of them. When the witness Fallon, the police officer, was on the witness stand and it became apparent that he was in the act of detailing the alleged confession of the defendant, the defendant's counsel asked the court for an investigation of the circumstances under which the alleged confession was made, and before the counsel could finish making his request, the court, without any suggestion or objection from the State's counsel, announced that the request was overruled. The defendant's counsel then made a motion for a formal investigation, and the court again overruled the motion in the same manner as before. The defendant's counsel then stated that he expected to prove that the defendant was beaten up by

the police, but the court continued to rule against his motion. The State's counsel then stated to the defendant's counsel that he would not be able to prove that the defendant was beaten up "if he lived to be a thousand." The defendant's counsel then replied that the court had already ruled. The court then at once, in reply to the defendant's counsel, said, "I will stand by the ruling, too; and there will be some trouble if somebody swears falsely." The defendant's counsel then made the following part of a further statement, "Your honor appreciates the fact——." The court immediately cut counsel off with this remark: "I appreciate no fact at all, but there may be trouble if somebody perjures himself in this case. Go ahead." After this remarkable statement by the court the defendant's counsel contented himself, as he clearly had to do, by saving exceptions to the remarks of the court.

The defendant objected to the introduction of a gun or revolver in evidence described as a nickel-plated, rusty gun with a black handle, found in the trunk of Margaret Byrnes in her flat, where the defendant was arrested. This gun was not shown to belong to the defendant and it was not shown that this gun was at the scene of the robbery, but the court overruled the objections and the gun was put in evidence. The court refused to allow the defendant's counsel to prove by the mother of the defendant that she saw marks of violence on the defendant at the time she visited him at the Austin police station. When the witness was proceeding to answer the question as to whether or not the defendant showed marks of violence at that time, the court stopped the witness with the words, "Wait a moment," and then came the objection of the State to the question, which the court promptly sustained.

The defendant's counsel objected to the State showing or proving the facts that the defendant had been staying and associating with Margaret Byrnes and the fact that he slept at her house, etc., claiming that there was no

proof in the record that Margaret Byrnes had any connection with the robbery and that therefore the defendant's connections and associations with her were immaterial, but the court overruled all the objections, and even allowed the State to prove that certain clothing found in Margaret Byrnes' room where she slept was the defendant's clothing, and the court compelled him, in the presence of the jury, to put on the clothing at the request of the State's counsel. These rulings were very prejudicial to the defendant and they were erroneous rulings, as the evidence tended to prove that the defendant was occupying the same bed-room at night that she did, and which was the evident purpose that the State's counsel intended the proof to have.

All the decisions of this court are to the effect that when the defendant, or his counsel for him, makes the claim to the court that the defendant has been maltreated and a confession extorted from him and asks for a preliminary hearing on that question, it is the duty of the court at once, out of the hearing of the jury, to hear evidence on the question of whether or not the confession was voluntary and made without promise or hope of favor or immunity and to determine that preliminary question before allowing the confession to go to the jury. It is true in this case that the defendant testified that he did not make any confession, and if that is true the maltreatment of him by the police would have only been admissible for the purpose of showing their hostile attitude to him, which the jury could have considered in passing upon the truthfulness of their statements that the defendant did actually make the confession. However, it was the court's hostile attitude to the defendant all through the trial, and his ill-tempered and vicious remarks in connection with this ruling, that is the principal cause of complaint in this case. The court made it plainly known to the jury that he was hostile toward the defendant, and by his remarks he clearly intimated to the jury that if the defendant made any such claim that he had been

maltreated by the police he would consider it perjury. The jury, as a rule, are ever watchful of the attitude of the court toward the defendant, and the defendant, in our judgment, cannot be more seriously prejudiced in a trial on a criminal charge than by the fact that the trial judge so conducts himself by his rulings and by his general attitude and language as to indicate to the jury a hostile attitude toward the defendant.

We do not think that the defendant has had a fair trial in this case and that for the reasons aforesaid the judgment of the court should be reversed and the cause remanded, and it is so ordered.   *Reversed and remanded.*

Stone and DeYoung, JJ., specially concurring:

We agree with the final judgment in this case but do not concur in all that is said in the opinion.