(No. 21095.— )

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* RUDOLPH HEGOVIC, Plaintiff in Error.

*Opinion filed February 19, 1932—Rehearing denied April 12, 1932.*

SAMUEL A. HOFFMAN, and CHARLES S. DOUGHERTY, (JOHN M. LONERGAN, of counsel,) for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, JOHN A. SWANSON, State's Attorney, and J. J. NEIGER, (EDWARD E. WILSON, and GRENVILLE BEARDSLEY, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

At the December term, 1930, of the criminal court of Cook county Rudolph Hegovic was convicted of murder and sentenced to imprisonment in the penitentiary for ninety-nine years. He has sued out a writ of error to review the record.

Marie Pelletier, who was murdered, lived with her husband, Louis, and their son, Lester, at 2521 South Ridgeland avenue, on the east side of the street, which was a north and south street, in Berwyn. She was employed by the Western Electric Company and her husband and son were also employed. On the evening of May 22, 1930, Louis came home soon after six o'clock. His wife had got home first and after serving dinner she went out to make some purchases. Lester came home about eight o'clock, after his mother had left. Louis went out and bought a newspaper and upon his return went to the basement, where he listened with Lester and a Mr. Wilder to the radio for a while and then went to a drug store at Twenty-second street and Ridgeland avenue where he bought a soda and soon after started home, about 9:30 or 10:00 o'clock. As he neared his home he saw his wife lying in the parkway in front of 2517 Ridgeland avenue and some men and girls standing near. He spoke to his wife but she did not answer or move. He called Lester from the basement and they carried her home and placed her on a bed. Dr. Kotalik, who had treated her prior to May 22, examined her

there and found a bullet wound in her chest. She was dead, and the doctor testified, without objection, that in his opinion her death was caused by a gunshot wound. On May 23 a woman's body was examined at the county morgue by Dr. Dwyer, a coroner's physician. There were two gunshot wounds through the chest, either of which would have proved fatal, but the body was not identified as that of Mrs. Pelletier. Counsel for the plaintiff in error, who are other than counsel representing him at the trial, contend that the record does not show that Dr. Kotalik was qualified to give an opinion as to the cause of death. It appears not only that his testimony was received without objection but that the defendant's counsel stated that they had no contention as to the cause of death and would offer no other evidence as to the cause of death.

Two girls who were walking north on the east side of Ridgeland avenue between Twenty-fifth and Twenty-sixth streets between 9:30 and 10:00 o'clock were the first persons to discover the body. On seeing it lying in the parkway they were afraid to go up to it and went back to the corner, where they called two men, and just as they came back to the body Pelletier came. Lester Pelletier testified that he was at home when he heard two shots fired, to which he did not pay much attention, as he thought they were backfire of an automobile. About thirty minutes later his father called him to the basement window and told him his mother was hurt. The house at No. 2517 Ridgeland avenue was the second house north of the Pelletier home at 2521 Ridgeland avenue, and Mildred Dvorak, who lived at No. 2517, heard two shots fired about ten o'clock and went to the window to look out. She could not see anything but immediately after the shots she heard the footsteps of a man running through the passageway between her house and the next house north. The footsteps were going east, but she did not hear them coming back and did not see anyone going through the passageway. She

heard the dog bark once. Valesta Rada lived in the next house north of Mrs. Dvorak. She was in the back part of the house about ten o'clock in the evening when she heard shots fired and someone running east along the passageway between the two houses as far as the gate between the front and the back yard. Her dog, which was chained back of the rear porch eight or nine feet east of this gate with a chain extending to the walk through the back yard to the alley, barked when the man ran through the yard. The footsteps then returned through the yard toward the front of the house. Lillian Jezek lived at 2402 Lombard avenue, four or five blocks east of Ridgeland avenue. As she was going to work on May 23 about 7:20 in the morning she found by the gate a woman's handbag. She looked for the address of the owner and notified Pelletier. There were three cents in the bag. William Mann testified that on the evening of May 22 he was at 2513 Ridgeland avenue ringing the bell, a few minutes before ten, when he heard two shots and in a few moments saw a man running through the yard of No. 2517. A dog barked twice. It was not light enough to distinguish the features of the man. In general build and height he resembled the plaintiff in error.

The plaintiff in error was arrested on September 4, 1930. Over the objection of the plaintiff in error the police officer who arrested him was permitted to testify that he took from him at the time of his arrest a .32-caliber nickle-plated Chicago Arms revolver containing four loads and one empty shell. This is assigned for error. There was no showing that the revolver was the gun used in killing Mrs. Pelletier or that she was killed with .32-caliber bullets.

His own statements and confessions were practically the only substantial evidence connecting the plaintiff in error with the crime. When the State's attorney asked Hugh T. McCarthy, a captain of police, if he questioned the plaintiff in error concerning the murder, his counsel objected,

and the court directed the jury to retire to the jury room. Out of the presence of the jury the court was about to proceed to hear evidence as to the competency of the supposed confession when the defendant stated, "Your honor, I want this point made clear; I made no confession at all." The court suggested that if he made no confession there was no question of its being voluntary, and the defendant said when he was taken to the police station the police beat him up. His counsel stated that the contention of the prosecution was that the defendant signed a confession, but the defendant said it was not true and he did not sign any confession, but counsel understood that the State had a paper which the defendant claims they made him sign. The court asked if the State was going to prove a confession and the State's attorney said he was. Thereupon the witness was withdrawn, and James Mikes, the chief of police of Berwyn, was examined and testified: "On Sunday, September 7, I talked to Rudolph Hegovic, the defendant, about the murder of Mrs. Pelletier. I did not offer him any inducement for making a statement and did not threaten him in any way. I did not promise him anything or abuse him nor did anyone in my presence. At the time I questioned him Lieutenant Cihak was present. The Chicago men were out in the squad room. They did not hear me. I asked him if he shot Mrs. Pelletier. He said he did. I asked him if he would show me how he shot her, and he showed me. He said, 'I shot her twice.' He took an automatic revolver and showed me how he shot Mrs. Pelletier. He said he bought the revolver in Racine, by parcel post; that afterwards he went to Mississippi and was arrested in Jackson. Later I took him into my office and asked if he would sign a statement, and he said that he would provided I would make him some promises. I said, 'I can't promise you anything.' We went along on the statement until we got to the murder charge. He stopped me then and would not talk any more. He said,

'I refuse to talk.' " The plaintiff in error then interposed the statement, "I refused to talk all the way through and he beat me up; I never made a confession." Upon the cross-examination of Mikes he stated that at a second interview between him and the plaintiff in error a stenographer was present who took notes of the conversation, but at the conclusion of the interview the plaintiff in error refused to sign a statement and the notes were not transcribed. Mikes said that they were available and he would have the stenographer in court. It does not appear that the stenographer did or did not come into court, but the plaintiff in error made no effort to use him to contradict Mikes' memory of the interview. Counsel for the People stated to the court that the People were relying upon the statement made to Mikes, a verbal statement made to police officer Prueffer and a written statement made to the same officer, a statement made to Captain McCarthy, and then, on the following morning, a statement made when the plaintiff in error was taken to the scene of the crime. The plaintiff in error then testified that he made no statement but he was beaten. Counsel for the People stated that all the officers were present and they were lined up for inspection by the plaintiff in error, who then testified that all of them had beaten him, kicking him between the legs and punching him in the stomach and face, but he made no confession. The court ruled that as long as the plaintiff in error said that he made no confession there was no need for further hearing. The jury was then brought in.

Prueffer, a police officer of the city of Chicago, testified that on September 7 he, with officers Billock and Cole, took plaintiff in error from Chicago to Berwyn and upon their return trip the plaintiff in error told him that he killed a woman in Berwyn; that "he was walking north and she was walking south, and when he came to her he said, 'Give me your purse.' She stepped towards him and he accidentally pulled the trigger twice. He turned around and

ran in between two houses across the alley, in between two more houses, and he said he turned to the left and went in between two more houses and he met with a dog, and when he got out into the alley he took six dollars out of the purse and threw the purse in a yard, and then from there he walked five or six blocks and went home. He said about June 5 he took a train and went to New Orleans. He stayed there four or five days and started for home. When he got through Jackson, Mississippi, he was arrested." Prueffer further testified that upon reaching the police station the plaintiff in error made a statement, which was typewritten and signed by the plaintiff in error. The written statement was put in evidence. It included the following questions and answers:

Q. "On May 22, about 10:55 P. M., were you in the vicinity of 2521 Ridgeland avenue, Berwyn, Illinois?

A. "Yes.

Q. "What happened that night?

A. "I met a woman and held her up at the point of a gun and asked her for her purse. At the time I asked her she came forward towards me, and I, being nervous, accidentally pressed the trigger twice in rapid succession while she was facing me.

Q. "Then what did you do?

A. "I turned around and ran between two houses, then I turned to the left to the corner, then I turned to the right going one block east, then I turned to the left and ran to the end of the block and ran between two houses and met a dog in the back yard, then I went through an alley and out into the street, took six dollars from the purse and threw the purse into the yard.

Q. "Then did you go home?

A. "I went straight east for several blocks to Fifty-seventh court and went home. * * *

Q. "Where is the gun now?

A. "As far as I know it is in Jackson, Mississippi.

Q. "Tell us how the gun got to Jackson, Mississippi.

A. "About the fifth of June, 1930, I went to New Orleans on a freight train and stayed there about four days, then I started on my way home, and while going through Jackson, Mississippi, I was picked up by a squad and taken to the police station. The gun was confiscated by the police."

The statement concluded that the statement was true and correct and not induced by threat, promise, fear or inducement of any kind.

On September 8, 1930, the plaintiff in error was taken to the office of Hugh T. McCarthy, who testified to a statement then made to him by the plaintiff in error giving the details of the murder, and that on the same day the plaintiff in error, in the company of McCarthy and representatives of the State's attorney, was taken to the scene of the crime and showed the officers where and how it occurred and the course followed by him in leaving the scene. The last statement was taken down by court reporter Harvey and read to the jury.

For the defense three witnesses, Katherine Slaby, Helen Slaby and Alice Stras, who lived in the immediate vicinity of the scene of the murder, testified that when the plaintiff in error and the police officers were standing in front of 2525 Ridgeland avenue the plaintiff in error said that he did not do it.

The plaintiff in error testified that he was nineteen years of age and had attended school to the fourth year in high school; that he did not sign the statement which had been admitted in evidence; that "if it resembles my name in any way it must be a clear forgery on the part of the police;" that he did not shoot Mrs. Pelletier. On cross-examination he testified that he did not go to New Orleans or Jackson, Mississippi; that he was never in Jackson, Mississippi, and that at the town hall in Berwyn he was taken into different rooms and beaten. In rebuttal, Peter Lahlum, a newspaper reporter, testified that he was

present when the questions were asked and answers given, which were written down and signed by the plaintiff in error as his written confession and saw him affix his signature to it. Jesse Wall, captain of detectives at Jackson, Mississippi, testified that on the morning of June 17, 1930, he saw the plaintiff in error, who first gave his name as James Ware but later as Rudolph Hegovic, in the jail there and had a conversation with him about a .38 automatic pistol, asking him what he was doing roaming about the country with a pistol. The plaintiff in error said he had found it on the highway. Wall communicated with the chief of police of Cicero and the boy's father. After he got a communication he wired the father that the boy was dismissed and was on his way home.

The claim of the plaintiff in error was, not that he was beaten and forced to make an involuntary confession but that he made no confession. It is claimed that, although the defendant testified that he had made no confession, the court erred in receiving evidence showing the confession after the plaintiff in error had testified on the hearing, apart from the jury, that he had been beaten by police officers, without hearing the police officers whom he charged with the offense of beating him. On the question whether or not the defendant made any confession, the fact that he was beaten has no direct bearing and evidence of such fact is not admissible on that question, but whether or not a confession was extorted from him by promises or threats, through hope or fear or by violence, is a question which does have a direct bearing on the .question of the competency of the evidence. Where the prosecution proposes to prove a confession by a defendant of his guilt of the crime with which he is charged, if no objection is made it will be admitted in evidence. If an objection is made that the alleged confession was not made, proof must be made by the prosecution that the confession was in fact made by the defendant and no preliminary evidence is re-

quired of its competency. On the other hand, if an objection is made by the defendant that the confession was not voluntarily made but was wrung from him by promises, hope, fear, torture or violence, it is not admissible in evidence without showing that it was voluntary, and the burden of proof on that question is on the prosecution. Upon such objection it is the duty of the court to hear, out of the presence of the jury, evidence of the circumstances of the making of the confession and upon such evidence determine the character of the confession as voluntary or involuntary and submit it to the jury or reject it accordingly. In *People* v. *Berardi,* 321 Ill. 47, it was said: "All the decisions of this court are to the effect that when the defendant, or his counsel for him, makes the claim to the court that the defendant has been maltreated and a confession extorted from him and asks for a preliminary hearing on that question, it is the duty of the court at once, out of the hearing of the jury, to hear evidence on the question of whether or not the confession was voluntary and made without promise or hope of favor or immunity and to determine that preliminary question before allowing the confession to go to the jury." This statement of the rule was followed by the further statement that that rule was not applicable in that case because the defendant there testified that he had made no confession, and if that was true the defendant could show his maltreatment by the police only as showing their attitude toward him, which the jury could have considered as bearing upon the truthfulness of the police officers who testified to the making of the confession. That case is not authority for requiring the trial court to conduct a preliminary hearing to determine the admissibility of confessions which the defendant claimed he did not make. The court did not err in not requiring, in the preliminary hearing as to the admissibility of the confessions in evidence, the testimony of all the police officers who were present when the confessions were

made, when it fully appeared that the contention of the plaintiff in error was that he had made no confession.

When testimony was offered to show that a revolver was taken from the plaintiff in error at the time of his arrest objection was made that it was immaterial and prejudicial, tending to increase the penalty which might be inflicted. The objection was overruled. There was no evidence tending to connect the revolver with the crime for which the plaintiff in error was being tried and the revolver itself could not have been admitted. (*People* v. *Doody,* 343 Ill. 194.) The error was not prejudicial to the plaintiff in error. Carrying a revolver several months after the crime could have had no tendency to increase the penalty for the murder.

The plaintiff in error was represented in the trial by the public defender but nevertheless persisted in interrupting the trial with irrelevant remarks and statements, which, of necessity, had a tendency to embarrass his counsel in the conduct of the defense and to create an unfavorable impression of him in the minds of jurors. His words indicated a good knowledge of the English language and an appreciation of the questions involved in the trial, but his interference with the trial and his counsel's wishes was without reason, useless and disorderly. Counsel who now represent him are not the same as on the trial. They argue that it was the duty of the trial court to see that the trial was conducted with decorum and not to permit the defendant to prejudice his cause by his conduct. The court cautioned the defendant and did all that could be done to prevent his disorderly conduct short of actual physical restraint. If the defendant, in spite of the warning of the court, chose to conduct himself in a disorderly manner and thus prejudiced his cause before the jury he cannot take any advantage in a court of review of any prejudice thus brought about by his own willful misconduct.

By agreement of the parties the court instructed the jury orally and no objection was made to any part of the charge. Therefore no question as to the instructions is preserved for review. *Bruen* v. *People,* 206 Ill. 417.

There is no error in the record for which the judgment should be reversed, and it is affirmed.

*Judgment affirmed.*