(No. 31467.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* FLORITTA RUFFIN, Plaintiff in Error.

*Opinion filed September 21, 1950.*

FRANCIS T. MCCURRIE, and JOHN M. BRANION, (ROBERT E. HARRINGTON, and JAMES F. ASHENDEN, JR., of counsel,) all of Chicago, for plaintiff in error.

IVAN A. ELLIOTT, Attorney General, of Springfield, and JOHN S. BOYLE, State's Attorney, of Chicago, (JOHN T. GALLAGHER, RUDOLPH L. JANEGA, and JOHN M. LONG, all of Chicago, of counsel,) for the People.

Mr. JUSTICE CRAMPTON delivered the opinion of the court:

This case comes to this court on a writ of error to review a judgment of the criminal court of Cook County, based on a jury verdict finding defendant, Floritta Ruffin, a colored person, guilty of the murder of John Baker, and which fixed her punishment at one hundred and ninety-nine years in the penitentiary.

She alleges there is reasonable doubt as to her guilt, because the evidence for the People is unsatisfactory and difficult to reconcile. She admits killing Baker by shooting him, but claims she did so in self-defense. Three of the persons who witnessed the shooting testified for the People; aside from the defendant, no one testified in her behalf in respect to the actual killing which occurred about midnight on October 15, 1946. Defendant entered a tavern on the south side of East Forty-seventh Street in Chicago, and seated herself at the bar, which ran north and south for about fifty feet parallel to the east wall, to which it was connected at the north end by a curved part. Her position at the bar was just south of the curve. After she had been there for some time, John Baker, also colored, and a white man entered the tavern, both of them strangers to the defendant, and took positions not far from her. On duty at the time were bartenders Earl Fernell in the north service area of the bar and Louis Williams in the south area. Sam Wilson, a visiting bartender friend of Williams, was at the south end of the bar. These three men were the eyewitnesses of the killing, who testified for the People. All present were colored, except the lone white man who had entered the tavern with Baker.

The defendant testified in substance: She was at her original position at the bar, drinking her second round of bourbon, when Baker approached her and said his friend seemed to like her and would like to buy her a drink. She told him she did not care for one and moved down the bar close to the waitresses' station, Fernell moving her drink for her. She finished that drink and had ordered another as Baker approached her a second time and told her his white friend had considerable money on him, and the two operating together, if they were smart, could get his money. She testified to spurning this offer of Baker's and requesting him to leave her alone. Thereupon Baker called her a "dirty black bitch" and then said, "You smart bitches, somebody tries to put something in your way and you haven't got sense enough to take it." In the meantime he had picked up a beer bottle standing on the bar and as he raised it to strike her, she shot him. She was seated at the bar when she fired the revolver. She did not know whether Baker had been hit, for he kept coming toward her with something in his upraised hand; it was something shiny and black, and appeared to her to be a gun. She got down off the bar stool and twirled around to get by him to the front door of the tavern. Baker followed her, raised his hand holding what she thought was a gun, and she shot at him the second time. She dropped the gun, ran from the tavern, and went to her home. She carried the gun in her purse, because her sister had been slugged and nearly raped about four days before and she feared she might be raped, as the approach to her apartment passed vacant lots, signboards, and through an alley.

The bartender, Fernell, was the only witness for the People close to the scene of the altercation which occurred immediately prior to the shooting. Fernell said he came on duty at 2 o'clock A.M., and the defendant was there at the time, being seated near the north end of the bar with several people. Sometime thereafter Baker and his

white companion came in. Before they entered, the defendant had moved farther south along his section of the bar, and the two took positions at the bar just about where the defendant had been seated. Baker ordered drinks, which the witness served, and the white man wanted to buy drinks for everyone in the place. Baker told him, "No, don't buy these niggers no drinks." When this was said, the defendant was seated about fifteen feet away from Baker. Nothing happened and Baker just started "wrangling around and talking, just talking to the different ones." The witness said defendant then remarked, "Just one thing about a nigger. He will look out for a white man's money." Just before this was said, the defendant had returned to the others who had remained at the place she formerly occupied, and Baker had come down to the bar to her. When the word "nigger" was mentioned, the witness looked around and heard defendant say, "You can't say that to me" or "do that to me," or something on that order. The first shot immediately followed that remark. This caused the witness to look up, and he saw defendant seated at the bar with Baker standing close to her. Baker started to walk away from defendant towards the front door. She left the stool, approached Baker, and fired the second shot. When this shot was fired, the two were close together and facing each other; for he had stopped when she caught up with him. Baker fell to the floor, and defendant stepped over him in making her exit from the place. The witness said he had noticed Baker had an artificial left arm and hand, the latter being covered with a glove.

Williams testified he was on duty at the south section of the bar and saw defendant and Baker at Fernell's end of the bar. He heard the first shot and raised his head to see what was happening. He saw Baker whirl over by the music vendor at the front end of the place and go towards the west wall close to the front door. When he whirled, the defendant, being to one side, moved over in

front of him and fired the second shot. When she did so, her back was to the west wall; she stepped over Baker in making her exit, for he had fallen near the doorway.

Wilson said he was standing near the south portion of the bar where the waiters get their service. When he first saw defendant in the place, she was drinking in front of the north half of the bar; people in the place were talking and drinking, and he was not giving it any particular attention. He heard the defendant say, "You can't say that to me," or whatever it was. She then shot Baker, who turned and walked away. The defendant walked around to his right side, got in front of him, put the gun under his neck, and fired the second shot, saying when she did so, "You are supposed to fall." She turned and ran out the door with the witness in unsuccessful pursuit of her.

Soon after the shooting, the three witnesses for the People made signed statements before the police and testified at the coroner's inquest. The defendant was not brought to trial until July, 1949, two years and nine months after the shooting. When the police entered her apartment a short while after the shooting, a window was found open, and underneath it a woman's footprint was found on the ground. A revolver was also found alongside that print. The defendant, according to police testimony, when taken into custody was shown the revolver and during the coroner's inquest, she admitted it belonged to her and was used when shooting Baker. The defendant testified she did not know whether she had identified the gun at the inquest, although she did have it in her hand at that time. When the defendant was taken into custody shortly after the shooting of Baker, the felony court, acting solely upon what the coroner's minutes disclosed, refused to bind her over to the grand jury and discharged her from custody. The defendant was subsequently indicted for murder and after a lapse of considerable time, was located in Chicago and again taken into custody. One police officer testified

that while she was being taken to the detective bureau, she said Baker had called her names, she had been drinking, and that she just lost her head and shot him. When apprehended the second time, she was living under an *alias*.

Certain assignments of error we will not consider, for the case must be reversed and remanded upon other assigned errors, and we must not analyze the evidence when there is a likelihood of the defendant being tried again.

The second allegation of error emerges from the giving of four instructions for the People wherein there was defined murder in terms of the statute, express and implied malice, malice aforethought, and that malice or intent may be presumed from the character of the act done, malice not being confined to ill will. Each instruction ignored the defendant's plea of self-defense and should not have been given; for all of the given instructions, when considered as a series, do not fully and fairly announce the law applicable to the theories of the People and of the defendant. Another instruction told the jury that if, after considering all the evidence, it finds therefrom that any witness has knowingly, willfully and corruptly testified falsely to any fact material to the issue in the case, it has the right to disregard the testimony of such witness or witnesses, except in so far as his or their testimony is corroborated by other credible evidence. This instruction left to the jury the determination of what were, and were not, the material facts in issue. The only testimony in the record, bearing directly and unequivocally upon the attitude and acts of Baker towards the defendant, prior to the firing of the first shot, and which bore upon whether what he did and said ever generated an honest and reasonable belief in the defendant she was about to lose her life or suffer great bodily harm, came from the defendant. The instruction was very prejudicial to defendant, for when she testified she became as any other witness. The verdict is evidence the jury believed she testified falsely. *People* v.

*Arcabascio,* 395 Ill. 487, contains our condemnation of the giving of such instruction, and therein we said, "Even if it could be determined with reasonable assurance that other instructions properly presented all the material facts, we hardly see how it could do anything else except confuse the jury." In a criminal case the material facts are the final essential elements of the crime, being the ultimate conclusions of fact from every variety of evidence tending to establish them. (*People* v. *Seff,* 296 Ill. 120.) Due to the fact that the other instructions given do not set forth what are the material facts in a manner clearly showing their relation to this instruction, and that many of those instructions should not have been given in the form they were, we can only believe that it was impossible for the jury to winnow those material facts out of the every variety of evidence tending to establish them, without the clear and specific instructions of the court as to what were the material facts in the case. Instructions are required to be accurate where the evidence is conflicting, and it is a question of fact whether defendant shot in self-defense. (*People* v. *St. Lucia,* 315 Ill. 258.) The court, at the instance of the People, gave an instruction on flight immediately after the commission of the crime charged. The defendant charges error, claiming that her flight right after the shooting could not be charged against her, after she had been exonerated at the coroner's inquest and discharged from custody by the felony court. That contention possesses no merit whatever. Neither does the one that the instruction shifted the burden of proof to her. Such flight may be considered by the jury as a circumstance, when coupled with other evidence, in determining the guilt or innocence of the defendant. *People* v. *Dustin,* 385 Ill. 68.

The third error assigned rests upon the refusal of the trial court to give three instructions for the defendant. The first simply stated the defendant was justified in protecting herself, even to the extent of taking his life, if the

actions and conduct of Baker produced in her mind a belief she was in danger of losing her life or suffering great bodily harm. The third one declared the burden rested on the People to prove her guilty beyond a reasonable doubt, for her defense of self-defense was the same as any other defense in respect to that burden. Other instructions given for the defendant contained the essence of these two and to have given them would have been repetition, in part, of the others. The defendant argues the first instruction should have been given because it applied specially to her testimony in regard to the conduct and action of Baker producing in her mind a belief she was in danger of losing her life or suffering great bodily harm. This instruction was not needed for the stated special purpose. The second instruction told the jury that when it considered whether the defendant acted in self-defense, consideration must be given to all the circumstances and conduct of the parties at the time and immediately following the shooting. Under the testimony given, this second instruction would have been apt; for it applied to that period of time within which there occurred, or did not occur, the conduct or acts of Baker which either justified defendant's acts as those of lawful self-defense, or condemned them as legally unnecessary. The third refused instruction, had it been given, would have amounted to no more than a reiteration of the sense of her instructions on self-defense the court did give. None of the instructions given in respect to malice ever indicated that the burden of proof shifted to the defendant because she entered the defense of self-defense.

The defendant, when cross-examining Fernell, used a portion of Fernell's testimony from the coroner's minutes in an endeavor to discredit his testimony given on direct examination. The People placed in evidence the written and signed statement made by Fernell to the police right after the shooting. The purpose of this was to place before

the jury the entire recorded conversation between Fernell and the police, when a part thereof had been brought out on cross-examination. The court overruled defendant's objections on the ground the point involved was the credibility of Fernell, as the defendant had questioned him with respect to statements he had made before the coroner, the court saying that the People had the right to present, and the jury was entitled to know, the necessary evidence to pass on the credibility of the witness, as well as the basic, essential facts in the issues of the case. The statement made to the police was then read to the jury. Whereupon the defendant moved that the jury be instructed to disregard the statement on the ground it was not made in the presence of the defendant. The motion was denied. The error committed was in allowing the statement in evidence when the attempted impeachment was based upon what Fernell had said at the coroner's inquest. It would have been proper to have admitted in evidence all of his testimony given at the inquest for the purpose of testimonial rehabilitation. The admission of the statement Fernell made to the police was highly prejudicial to the defendant. It was admitted, according to the trial court, for two purposes: to aid the jury in passing upon the credibility of Fernell as an eyewitness; and to aid that body in passing on the basic, essential facts in the issues of the case. This was the introduction in evidence of an unsworn statement made before trial, and out of the presence of defendant. The erroneous admission of the statement, coupled with the remarks of the court made at the time regarding the purpose of admission, undoubtedly had a pronounced effect on the jury, which could have prejudiced the jury against the defendant.

The errors considered were material ones. Together, they operated to deprive the defendant of the fair and impartial trial guaranteed to her by law; and the trial court erred in denying her motion for a new trial. The

defendant has assigned other errors which we have considered. It is unlikely the circumstances of the first trial, which caused those assignments to be made, will occur during a second trial.

The judgment of the criminal court is reversed, and the cause is remanded for a new trial.

*Reversed and remanded.*