(No. 38744.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, *vs.* EDWARD COOK, Appellant.

*Opinion filed September 29, 1965.—Modified on denial of rehearing November 18, 1965.*

BELLOWS, BELLOWS & MAGIDSON, of Chicago, for appellant.

WILLIAM G. CLARK, Attorney General, of Springfield, and DANIEL P. WARD, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and ELMER C. KISSANE and MATTHEW J. MORAN, Assistant State's Attorneys, of counsel,) for the People.

Mr. CHIEF JUSTICE KLINGBIEL delivered the opinion of the court:

The defendant, Edward Cook, and John Fecarotto, were jointly indicted in the criminal court of Cook County for the crime of armed robbery in an indictment which charged that the defendant had previously been convicted of robbery. The cause was tried by jury, resulting in a verdict of not guilty as to Fecarotto and a verdict of guilty as to the defendant, without a finding that he had previously been convicted of a felony. Judgment was entered on the verdict and the defendant was sentenced to the penitentiary for a term of not less than 10 years nor more than life imprisonment. The case is now before us on appeal, a constitutional issue having been presented.

Before discussing the constitutional claim and the other arguments advanced by the defendant, we believe it is ap-

propriate to summarize the evidence in the case. The defendant was charged with the armed robbery of a tavern on the corner of North Avenue and Keating. The manager testified that there was a front entrance on an angle at the corner and 2 doors on the Keating side. At about 4:00 A.M. on November 25, 1948, there were about 10 or 12 people in the tavern when three masked men entered the front door and announced that they were holding up the tavern. While one of the men was taking the money from the cash register the manager, who was standing with his hands in the air, noticed a police car drive by. A few seconds later a police officer appeared at the front door and told the robbers to come out with their hands up. The witness then heard shots fired and dropped to the floor. He heard one of the robbers ask where the rear door was and heard one of the customers tell him that it was through the dining room. The witness was unable to identify the defendant.

The bartender and several customers testified that the robbery had occurred in substantially the manner the manager had related. They likewise were unable to identify the defendant.

Police officer John McCarthy testified that as he was riding in a police car with officers Rawleigh and Troogstad, he looked in the tavern and saw a man with his hands in the air. He and Rawleigh jumped out of the car and Rawleigh opened the front door and told the robbers to come out. McCarthy walked in the tavern and the man who was standing at the cash register fired two shots at him. The officer returned the fire and he and Rawleigh backed out of the door. McCarthy apprehended a man outside the tavern and held him in custody while Rawleigh and Troogstad attempted to capture the robbers. It later developed that the man captured by McCarthy had not been involved in the robbery. McCarthy could not identify the defendant.

Officer Rawleigh corroborated McCarthy's testimony. He also testified that after he and McCarthy left the tavern

he saw a man run out of one of the side doors with a pistol in his hand. He did fire one shot and shouted to Troogstad, who shot the fleeing bandit with a shotgun. This man, Guido Saipari, later died of the gunshot wound. Rawleigh then proceeded to the rear side door and as he entered this outside door he noticed a man with a pistol in his hand coming out of an inside door toward him. Rawleigh identified the defendant as the man he saw. He fired a shot at the defendant, who ran back into another room. Rawleigh then heard the sound of breaking glass and shouted to Troogstad that a man was escaping into the alley and he and Troogstad ran to the alley in the rear of the building. They were unsuccessful in their attempt to capture the fleeing robber and in the confusion the man whom Rawleigh had also seen escaped. Rawleigh testified over objection that he later looked at some pictures at police headquarters and identified the defendant's picture as that of the man he had seen in the tavern. On cross-examination, Rawleigh testified that there was no light in the room he had entered but that there was a light in the room from which the defendant had come and that he had seen the defendant's features for about 2 seconds when he was in the doorway. On redirect, he was asked if he was positive that the defendant was the man he had seen. He replied that he was positive, but defendant's counsel objected, stating that this was a question for the jury to determine. The court sustained the objection and remarked that the identification had already been established.

Troogstad's testimony in general corroborated the testimony of the other officers. He also testified that when he heard the crash of glass and heard Rawleigh shout to watch the alley he ran to the alley where he heard shots and the sound of scuffling and pursued a man whom he identified as the co-defendant, Fecarotto.

Police officer O'Rourke testified that he had arrested the defendant at about 10:00 P.M. on December 4, and that on either December 6 or December 7 he had a conversation

with the defendant in which the defendant admitted participating in the robbery. O'Rourke testified that the defendant told him that he, Saipari, and a third man, whose name he did not divulge, were the three men who were in the tavern when the police entered. The defendant said that he ran to the rear of the tavern looking for an exit. When he could not find a rear exit he ran to a side door and, as he attempted to go outside, an officer fired a shot at him. He then heard some shooting in the distance and looked out the door. There was then no one on the street and he ran across the street and down an alley. He made his way home where he and his girl friend took a cab to a hotel where he lived until his arrest. On cross-examination O'Rourke testified that he had not threatened the defendant.

For the defense, the defendant testified that he had known Saipari when they were in the penitentiary together but had never associated with him after the defendant was released. He denied taking part in the robbery and testified that he had been with his girl friend until about 3:45 on the morning of the robbery and that he then went home to bed. The following day he read a newspaper account of the robbery and learned that Saipari had been slain. Three days later he moved into a hotel with his girl friend, where he registered as Edward LeClair. He testified that he was arrested on December 4 and taken to a police station where he was stripped and examined for gunshot wounds. After about 15 or 20 minutes he was taken to police headquarters where he was questioned about the robbery and his friendship with Saipari. He denied taking part in the robbery and said he had only seen Saipari a few times since he had been released from the penitentiary. The following morning he was questioned again and a police officer told him that he should tell Touhy, who was the officer in charge of the investigation, what he wanted to know because Touhy was a tough man. In the afternoon he was placed in a police lineup. He was briefly questioned after the line-up and was then

permitted to sleep. He was awakened after several hours and questioned again. After this questioning he was locked in a room where he was questioned several times during the night by various officers who were in and out of the room. At about 10 A.M. on December 6 he was again questioned briefly and about two hours later he was asked to sign a statement admitting his participation in the robbery and was told that he would get off with "easy time" if he signed, but he refused to do so. That afternoon a written statement was presented to the defendant but he told the police that they could beat him if they wanted to, but he wouldn't sign. He testified that one of the officers told him that they had something new and that they didn't beat people any more. He was not questioned again until about 1:00 o'clock on December 7. He again denied his guilt and several hours later he again denied taking part in the robbery. He testified that he never admitted his guilt.

In rebuttal, the officers involved denied making the promises and threats imputed to them by the defendant. An unsigned written statement was admitted in evidence. An officer testified that this statement was taken from the defendant at about 11:15 A.M. on the morning of December 7. In that statement the defendant denied that he had participated in the robbery and he said that he moved to the hotel where he registered under another name because he was afraid he would be picked up by the police because of his criminal record and his friendship with Saipari.

We turn first to the constitutional question presented by the defendant. He alleges that he was deprived of due process of law by the admission in evidence of his oral confession which he claims was involuntary and also urges that he was deprived of due process of law by reason of the fact that no hearing was held to determine the voluntary nature of the confession. We note at the outset that the defendant consistently denied making any oral confession. At the time this case was tried it was the rule in this State that where

a defendant denied making a confession a preliminary hearing to determine the admissibility of the confession was not required, (*People* v. *Hegovic,* 348 Ill. 58) although the United States Supreme Court had, prior to the trial of this case, handed down its opinion in *Lee* v. *Mississippi,* 332 U.S. 742; 92 L. ed. 330, 68 S. Ct. 300, in which it was held that a defendant who denies making a confession is not precluded from raising an issue of whether the confession was voluntary. In 1963, in *People* v. *Norfleet,* 29 Ill.2d 287, we recognized that the *Lee* case had abrogated the *Hegovic* rule and held that one who denies making a confession is entitled to a hearing to determine the voluntary nature of the confession. Since *Norfleet* will control in the new trial hereinafter ordered, further consideration of this question is not necessary.

The next argument advanced by the defendant also relates to the confession. The court refused to give the following instruction:

"The Court instructs the jury that in determining the credibility to be given to the alleged oral statement made by the defendant, Cook, they should take into consideration the length of time the defendant was interrogated by the police officers and the manner in which he was questioned by the police officers and any other circumstances surrounding the taking of said statement which would tend to shed light as to whether said statement is true as to whether or not the defendant did actually make the oral statement testified to."

The defendant argues that the failure to give this instruction deprived him of his right to submit to the jury the issue of the credibility and weight to be given the confession. It is the rule in this State that the admissibility of a confession which is challenged on the ground that it is involuntary is a matter for the trial judge to determine in the first instance by a hearing out of the presence of the jury. (*People* v. *Kemp,* 29 Ill.2d 321.) If the court rules

that the confession is voluntary and the confession is admitted in evidence, the defendant still has the right to present evidence to the jury which affects the credibility or weight to be given the confession. (*Townsend* v. *Sain,* 372 U.S. 293, 9 L. ed. 2d 770, 83 S. Ct. 745; *People* v. *Scott,* 28 Ill.2d 131; *People* v. *Schwartz,* 3 Ill.2d, 520, 523.) In order to submit this issue to the jury, the defendant is entitled to an instruction advising the jury that they may consider all the circumstances in regard to the making of the confession in determining whether the confession was true or false, or partly true or false. (*People* v. *De Simone,* 27 Ill.2d 406, 411.) We are therefore of the opinion that the instruction in question should have been given to the jury so that they might determine whether the defendant made any confession at all, and if so, to determine the weight and credibility to be given the confession. Therefore the cause must be reversed and remanded to the trial court for a new trial.

One of the other arguments on this appeal concerns a matter which might arise on a new trial and we consider it appropriate to discuss it. The defendant claims that the court erred in permitting officer Rawleigh to testify that he had identified the defendant's picture and in admitting the picture in evidence. It is argued that the extrajudicial act of identifying a photograph is a "hearsay act". We do not believe the evidence in question is subject to this objection. In *People* v. *Carpenter,* 28 Ill.2d 116, we noted that the common belief that all statements made out of the presence of the defendant are inadmissible as hearsay was based upon a misconception of the hearsay rule. We pointed out that the essential feature, without which testimonial offerings must be rejected, is the opportunity for cross-examination of the party whose assertions are offered. Here, Rawleigh was present in court and was subjected to cross-examination. Cases such as *People* v. *Moretti,* 330 Ill. 422, and *People* v. *Scott,* 296 Ill. 268, which are relied upon by the defendant,

are not in point, for in those cases the testimony was offered, not to prove that the witness who testified had previously identified the defendant, but to prove that a third party had done so. This distinction is illustrated by our opinion in *People* v. *Harrison*, 25 Ill.2d 407. In that case two girls who were the victims of an assault, testified that they had identified the defendant's photograph at the police station and had later picked him out of a line-up. The older girl identified the defendant at the trial but the younger girl did not. A police officer testified without objection that he was present when both girls identified the defendant's photograph and pointed him out in the line-up. We noted that the officer's testimony could only have been offered to bolster the testimony of the older girl and to close the gap created by the failure of the younger girl to identify the defendant at the trial, and held that for that purpose it was clearly hearsay and inadmissible. In spite of the fact that the evidence was received without objection, we held that it could not take the place of testimony under oath by the younger girl identifying the defendant. In that case we considered as competent testimony the testimony of the girls that they had identified the defendant's photograph, and held only that the testimony of the officer as to what the girls had done was incompetent. In the present case the officer's own testimony that he had identified the defendant's photograph was properly admitted. We have consistently approved and regarded as convincing evidence the fact that the victim of a crime has identified the defendant from a photograph or a police line-up. (*People* v. *Brown*, 16 Ill.2d 482; *People* v. *Gray*, 24 Ill.2d 229; *People* v. *Miller*, 27 Ill.2d 336.) The admission in evidence of Rawleigh's testimony and the picture was not prejudicial error.

In view of the fact that this cause must be remanded for a new trial we refrain from expressing any opinion as to the defendant's guilt and find it unnecessary to analyze the evidence. (*People* v. *Schwartz*, 3 Ill.2d 520, 523; *People*

v. *Ruffin*, 406 Ill. 437, 422.) We likewise find it unnecessary to consider the claims that the defendant's sentence was excessive and that he was prejudiced by a remark made by the trial judge.

The judgment of the criminal court of Cook County is reversed and the cause is remanded for a new trial, in accordance with the views expressed in this opinion.

*Reversed and remanded.*