(No. 13757.—Reversed and remanded.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* WILLIAM SCOTT, Plaintiff in Error.

*Opinion filed February 15, 1921.*

1. CRIMINAL LAW—*what testimony as to voice of defendant is not evidence of identification.* The testimony of a witness who about the time and near the scene of a murder met a man who asked him the time of day, that he did not notice any peculiarity in the voice, but that a few days afterward when he heard the defendant speak at the police station he noticed his voice was similar to the voice of the man he had met, in that it had a falsetto tone, has no tendency to identify the defendant as the murderer.

2. SAME—*testimony at the coroner's inquest is not admissible to identify the defendant—impeachment.* The testimony of a witness at the coroner's inquest is not admissible for the purpose of identifying the defendant in a trial for murder, and where the same witness testifies on the trial the only purposes for which he may be interrogated as to his previous testimony are to refresh his memory and to impeach his credibility.

3. SAME—*trial should be free from substantial error where a conviction rests upon conflicting evidence of identity of defendant.* Where the only question in a murder trial is the identity of the

defendant the prosecution must establish the identity beyond a reasonable doubt, and where the question is seriously and closely contested and the evidence not positive the cause should be submitted to the jury without substantial error on the trial.

4. SAME—*when letter found on defendant is not admissible to identify him in trial for murder.* In a trial for murder, a letter found on the defendant is not admissible to identify him as the murderer where its contents consist merely of an invitation to take part in a business the nature of which is obscurely expressed but which the prosecution attempts to show by cross-examination was the business of picking pockets, as the only tendency of such evidence is to prejudice the jury against the defendant.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. HUGO PAM, Judge, presiding.

LEO L. DONAHOE, for plaintiff in error.

EDWARD J. BRUNDAGE, Attorney General, MACLAY HOYNE, State's Attorney, and EDWARD C. FITCH, (EDWARD E. WILSON, and LLOYD D. HETH, of counsel,) for the People.

Mr. JUSTICE DUNN delivered the opinion of the court:

William Scott having been convicted in the criminal court of Cook county of the murder of Joseph S. Grossfield and sentenced to imprisonment in the penitentiary for life, has sued out a writ of error to reverse the judgment.

There was no dispute about the circumstances of the murder, the question on the trial being as to the identity of the defendant as the murderer. The facts were testified to by Bert Deutsch, who was the only witness of the murder. He was a cigar maker, living at 4523 Calumet avenue, diagonally across the street from Grossfield's grocery store, at the southwest corner of Forty-fifth street and Calumet avenue, where the tragedy occurred. He testified in chief that he went to the store about 7:05 o'clock on the morning of December 18, 1918, to buy a bottle of milk, and when he went near the counter he heard the command,

"Hands up!" and was covered by a gun in the hands of a man who held another gun pointed at Grossfield. No one else was present and the man was in the store before the witness. He ordered the witness back of the counter and demanded money of Grossfield, who was also back of the counter, but Grossfield said he had no money. The man continued to demand money from Grossfield, who pulled out some papers and then put them back in his pocket. The man then demanded money of the witness, who said, "You can have all I got; I ain't got anything." The man then felt the pockets of the witness and again asked Grossfield for money. Grossfield said he had none, and the man said, "What's the matter with the cash register?" Grossfield went to the cash register and the man took the money and put it in his pocket and still kept asking for money, and Grossfield said he had none. The man then after some further discussion made a rush to the counter and pulled out the drawer and put his hand in it. He continued to argue with Grossfield and then turned around and started to walk out. Grossfield followed and took him by the coat collar and was holding him and would not let him loose. He pushed Grossfield, who was still hanging on. The witness, who was still behind the counter, heard three shots. The man had his hand down and fired three shots and pushed Grossfield, who still hung on. The man then shot Grossfield "straight" and Grossfield fell. The witness estimated that the affair occupied about ten minutes. He testified that he again saw the man at the inquest. He was asked whom he saw, and answered, "I think that man in there that was supposed to be there; that was there." He then identified the defendant as the man at the inquest, and testified that the man was brought down to the store a short time after the murder and was there seen by the witness.

The examination so far was conducted by the court with the consent of the State's attorney and the defendant.

The witness was cross-examined first by counsel for the defendant, and testified that the defendant had "his [the murderer's] ways and his movements, but to swear positively that this is the man, I cannot do it;" that the defendant was brought to the store four or five days after the murder and the witness understood that he had confessed; that he would not swear positively that the defendant was the man; that he had also previously gone to the police station at Forty-eighth street, where the defendant was confined, and picked out the defendant from several others as the man who committed the murder, identifying him by his size, actions and ways; that he gave a description of the man to the police, describing him as being between five feet and six inches and five feet and seven inches tall, wearing a cap and dark-brown coat, about thirty-four or thirty-five years of age, weighing about 150 pounds, and of dark complexion. The witness testified that on the occasion of the murder he was not wearing his glasses; that he could see a little without them but not very well. At the request of counsel he took off his glasses and was unable to see a pencil held by the counsel at a distance of from fifteen to eighteen feet. He testified that he had seen several doctors about his eyes and was in several clinics but had given them up. He did not remember whether there was a light in the store at the time of the murder or not. The witness was then cross-examined by the State's attorney, and testified that he did not remember making a positive identification of the defendant at the coroner's inquest, which was held on December 29, nor that he made a positive identification before the grand jury, but testified that he did then describe him by his size, his ways, movements, height and weight. The witness testified he could read some without his glasses, and the man in the store was about two feet away at the time he felt the witness' pockets; that the man who committed the murder had on a gray cap and a dark coat, was about five feet seven inches

tall and weighed 145 to 148 pounds. He had a "kind of goat skin; it was quite a dead color; dark color; bad color." He was smooth shaven. After he left the store he went west on Forty-fifth street. The witness gave the description to the police about noon or afternoon of the same day. In rebuttal the prosecution proved excerpts from the testimony of this witness at the coroner's inquest about which he had been asked on cross-examination, tending to show that he had positively identified the defendant at that time.

Two other witnesses testified on the question of identity. Mrs. Edward Thetard was at the corner of Forty-fifth street and Calumet avenue when the shots were fired,—across the street from the store. She heard three shots, and a moment later a man came from the store, turned up his collar, walked west on Forty-fifth street to the end of the store, and then "ran to the left of the alley, turned down the alley and went east." The man had on a dark overcoat, which was drawn in at the waist line and was about three-quarter length, and wore a lighter cap. He was five feet seven or eight inches tall. It was just breaking day. On cross-examination the witness testified that when she testified at the inquest she thought the accused was about two inches shorter than the man whom she saw leave the store. Plaintiff in error at the suggestion of his counsel put on a cap and coat which were his property, turned up his collar and walked around at a distance of about forty feet from the witness, and she testified that his figure resembled the man.

James A. Higgins testified that he was stock-keeper for the International Harvester Company tractor works and about six o'clock of the morning of December 18 he was at the corner of Forty-fifth street and Calumet avenue, walking east across Calumet avenue to mail a letter in the mail-box, and met a man who asked him as he passed, "About what time is it?" Witness answered, "It is about

six o'clock," and did not stop. The man wore an overcoat and cap. The witness noticed nothing else at the time and noticed no peculiarity in the man's voice, but a few days later he was taken to the police station to identify the defendant and then noticed a peculiarity in his voice similar to the voice of the man he had met. "The voice didn't seem coarse as the ordinary man's voice, and it was not fine exactly, like a woman's voice. It perhaps, you might say, had a falsetto tone." He would say that the voice he heard at the police station was the same as the one he heard on the street and was positive of it at the time, but he did not know whether the defendant was the man he met that morning or not.

There was no other evidence in the record bearing on the question of identity, which, except for the direct testimony of Deutsch, rests upon height, weight, age, kind of clothes and general appearance, none of which were described as unusual and all of which are things which are common to a great many men and of little weight as proof of identity of any individual. All of the facts testified to by the witnesses, except Deutsch, were not sufficient to justify the belief that the defendant was the man who committed the murder, and none of these witnesses testified that the defendant was the man to whom their testimony referred or that they believed he was. The case rests practically upon the uncorroborated testimony of Deutsch, who testified that he could not say positively that the defendant was the man and would not do so. The falsetto voice of the man who asked Higgins the time on the street corner an hour before the murder has no tendency to identify him as the murderer.

The defendant testified denying that he committed the crime or had any knowledge of it. The testimony of Deutsch before the coroner's jury was not competent for the purpose of establishing the identity of the defendant and could not be considered by the jury for that purpose.

296—18

His testimony on the trial of this cause was the only statement made by him which the jury had any right to consider on the question of identification. The only purposes for which he could be interrogated about his previous statements were to refresh his memory and to impeach his credibility. If the questions failed to refresh his memory that purpose failed. The only purpose, then, for which his previous statements could be introduced, if they were admissible at all, was to impeach his credibility. Since the case for the prosecution rested wholly on his testimony it is difficult to see how it could be improved by impeaching his credibility and thereby weakening his testimony. At any rate, the case could not be made out by his previous statements at variance with his testimony. What he testified to at the coroner's inquest was not evidence on this trial of the facts he testified to there, and could not be considered on the question of the guilt of the defendant but only as to the credibility of the witness and in weighing his testimony. *Moore* v. *People,* 108 Ill. 484; *Ritter* v. *People,* 130 id. 255; *Purdy* v. *People,* 140 id. 46; *Hurley* v. *State,* 46 Ohio St. 320; *State* v. *Callaghan,* 18 S. D. 145.

It was necessary for the prosecution to establish the identity of the defendant by the evidence beyond a reasonable doubt, and it is manifest that this was the only question in the case, that it was seriously and closely contested and that the evidence was such as to require the cause to be submitted to the jury without substantial error on the trial. After the defendant was arrested police officers went with him to his room, and found there, among other things, a letter about which he was questioned on cross-examination. He stated that it was from a man by the name of Gehrung and was received by the defendant just before he came to Chicago from Toledo. The letter was admitted in evidence over defendant's objection and is as follows:

"Dear Friend Scotty—I thought you might drop me a line when you got home, but not hearing from you am writing you this. I am sure glad you got out of your trouble O. K., as I heard things looked pretty bad for you. Well, how are things coming for you in Toledo? Sal had a letter from Lena saying that things are not breaking for you there and that you wanted to come back to Chicago. I am working two strong with a party right now. We are going along pretty good, but if you want to come back here, Scotty, I will break with other party before you get here, so let me know as soon as possible what you intend doing. We can make two strong, the same as we did before. You know yourself what we can do before Christmas, as things are opening up around here. It is always good here a few weeks before Christmas and after. Everybody is making plenty of money around here, so let me know what you intend doing at once, otherwise if you are not coming right away I am going to leave for the road with the party I am with now. Well, this is about all for this time until I hear from you, so will close with regards from your friend,

GEORGE.

"Address George F. Gehrung, 764 Oakwood boulevard, Allen Apartments, Chi., Ill.  A/C Apartment 806."

Before the admission of this letter the defendant's counsel objected to any cross-examination about the letter, but the court overruled the objection. The State's attorney had asked the defendant if he and Gehrung were not in business going over the country picking pockets, and the defendant said they were not; that Gehrung was in the carnival business but the defendant had never worked with him in that business. He was asked what Gehrung meant by that letter, and answered, "Why, he wanted to ask me to come here to put on some of those humpty-dumps that he put on in the windows here during the holidays,—toys they had put on in the northwest during the holidays." The court asked, "What does 'two strong' mean?" and he answered, "It means working at the carnival business, and he wanted to go away, and he was going to put in those toys in the windows for the holidays and after that go on with the carnival business." The State's attorney then asked this question: "You worked as a pick-pocket with Gehrung, didn't you? You may as well be truthful about it.  Isn't

it a fact that you worked as a pick-pocket with Gehrung in Toledo and you came here? He wanted you to come here and work as a pick-pocket with him?" Defendant answered, "No, sir." The letter then, over his renewed objection, was read to the jury.

It is evident that the letter has no connection with the crime charged and no tendency to prove the defendant guilty. Its only effect was to get before the jury that the defendant had been in trouble which looked pretty bad for him before his present trouble, with the intimation of the. State's attorney that this former trouble was with the criminal law; that he was a pick-pocket and had worked as a pick-pocket with Gehrung, and this letter was an invitation to come to Chicago and work as a pick-pocket with him. It needs no discussion to demonstrate the damaging effect of such an argument to the jury in a very close case. While it had no tendency to prove the defendant guilty of murder, it had a tendency to make the jury believe he was a bad man, to prejudice them against him and close their minds to a fair consideration of his case on the merits of the charge for which he was on trial.

It is argued that the letter was admissible to show the close relation between the defendant and Gehrung and the cause for the change Deutsch is alleged to have made in his testimony. If there was any substantial change in Deutsch's testimony there is no evidence that Gehrung suggested it or that defendant had any communication with Gehrung. Gehrung told Deutsch he did not believe Scott was the man, and that is all the record shows about Gehrung, except the defendant's testimony about him.

In view of the testimony in the record the admission of this letter was error for which the judgment should be reversed, and it is reversed and the cause remanded.

*Reversed and remanded.*