No. 55,370

STATE OF KANSAS, *Appellant,* v. SHERMAN L. GALLOWAY, *Appellee.*

(680 P.2d 268)

Review of the judgment of the Court of Appeals in an unpublished opinion filed October 21, 1983.

Opinion filed March 24, 1984.

*Robin Fowler,* assistant district attorney, argued the cause, and *Mary D. Prewitt,* assistant district attorney, *Jerry L. Harper,* district attorney, and *Robert T. Stephan,* attorney general, were on the briefs for appellant.

*Jeffrey O. Heeb,* of Lawrence, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

McFARLAND, J.: This is an interlocutory appeal by the State pursuant to K.S.A. 22-3603 from an order of the district court suppressing and excluding evidence. The Court of Appeals dismissed this interlocutory appeal on the basis the order appealed from was not final. This court granted the State's petition for review.

Defendant Sherman L. Galloway is charged with rape (K.S.A. 21-3502); aggravated sodomy (K.S.A. 21-3506); aggravated robbery (K.S.A. 21-3427); and kidnapping (K.S.A. 21-3420). This is not the first time this case has been before this court on an interlocutory appeal by the State. (*State v. Galloway,* 232 Kan. 87, 652 P.2d 673 [1982], hereinafter referred to as *Galloway I.*)

The complex factual situation underlying this case was stated in *Galloway I* as follows:

"On May 12, 1981, at approximately 12:30 a.m., Ms. G, a Kansas University (KU) graduate student, was attacked by a black male as she walked home. The man forced her into his car and drove her to Clinton Park in Lawrence where he raped her and sodomized her. He then left the park taking with him Ms. G's clothing, a set of keys to KU buildings issued to her, a backpack containing a textbook with the victim's name in it, a swim cap, a coin purse and other items. Ms. G went to her apartment immediately after the incident and reported it to the police, who came and took her statement that night. The next day she aided the police in assembling a composite of her assailant and notified them of the items of personal property taken from her by the rapist.

"On July 8, 1981, at approximately 10:20 p.m., Ms. R was jogging on the KU campus when she was attacked from behind by a black male wearing a sleeveless tank top shirt. He threatened Ms. R with a knife and dragged her down a hill into a bushy area where he raped and sodomized her. Ms. R managed to struggle free and run to a nearby street where she received a ride from a passing motorist. She notified the KU police, who went to the area and found a billfold containing the driver's license of Sherman L. Galloway. The next day officers of the KU police department (KUPD) submitted to Ms. R a photographic lineup of eight black males. From the photographs she identified Sherman L. Galloway.

"During the afternoon of July 9, 1981, a warrant for the arrest of Sherman L. Galloway was issued charging him with the rape (K.S.A. 21-3502) and aggravated sodomy (K.S.A. 21-3506) of Ms. R. The same day Lt. Detective Vic Strnad of the

KU police department obtained a search warrant for the residence of Sherman Galloway. The officers were authorized to seize 'one (1) sleeveless tank top shirt appearing to be brown in color with horizontal stripes and one (1) knife with a curved blade approximately ¾ inch wide and approximately three to four inches long.'

"KU Detectives Strnad and Mike Riner and Lawrence police Detective Mike Hall executed the warrants during the evening of July 9, 1981. Detective Hall found a knife, which he seized, in the drawer of a nightstand. Next to the knife he observed a ring with KU keys on it. Detective Hall showed the keys to Detective Riner who also recognized them as KU keys. The officers then seized the keys. Other property taken in the search included drug paraphernalia and a portable food warmer marked 'Property of Domino's Pizza. If found return to Domino's for reward.'

"On July 14, 1981, Detective Hall contacted Ms. G and showed her a ring of KU keys. She identified the keys as those taken from her by the person who sexually assaulted her on May 12. She later identified Galloway as her assailant from a photographic lineup.

"On July 22, 1981, Detective Hall obtained a warrant authorizing another search of Galloway's residence, along with his automobile. Property listed on this search warrant included most of the things taken from Ms. G when she was attacked. During this search officers found and seized Ms. G's backpack, textbook, class notes and swim cap.

"On July 24, 1981, an amended complaint was filed charging Galloway with rape and aggravated oral sodomy concerning Ms. R and kidnapping (K.S.A. 21-3420), aggravated robbery (K.S.A. 21-3427), rape and aggravated oral sodomy concerning Ms. G. The Ms. R charges were later severed from the Ms. G charges.

"On September 25, 1981, Galloway filed a motion to suppress the KU keys seized from his residence on July 9, 1981. The trial court granted the motion and the State took an interlocutory appeal. The Court of Appeals, in an unpublished opinion, upheld the trial court. This court then granted the State's petition for review." 232 Kan. at 87-89.

This court in *Galloway I* reversed the district court's suppression of the seized keys and the Court of Appeal's affirmance thereof and remanded the case for further proceedings. The issue in *Galloway I* focused upon the State's right to seize the ring of keys during the execution of the search warrant. As indicated in the statement of facts, the charges relative to victims Ms. R and Ms. G, while contained in one complaint, had been severed. Defendant has been convicted of the charges relative to victim Ms. R and the conviction has been affirmed by this court in an unpublished opinion. (*State v. Galloway,* No. 54,304, filed March 26, 1983.) The issues herein solely relate to the charges pending relative to victim Ms. G.

After the case was remanded to the district court for further proceedings, certain evidentiary motions were heard. The dis-

trict court sustained defendant's motions: (1) to suppress a composite photograph of a completed "Identi-Kit"; and (2) the photographic lineup identification of the defendant by the victim. Additionally, the district court held, on the State's motion in limine, the State would not be permitted to introduce any evidence relative to observation of the keys by defendant's wife. (Whether these rulings were temporary or final is one of the issues on appeal and the facts relative thereto will be set forth in detail in the discussion of that issue.) The State then filed this interlocutory appeal pursuant to K.S.A. 22-3603 as to all three adverse rulings.

## I. JURISDICTIONAL ISSUES

The first jurisdictional issue is whether the evidentiary rulings herein are the proper subjects for an interlocutory appeal pursuant to K.S.A. 22-3603. It should be noted the district court did not base any of the complained-of rulings on violation of defendant's constitutional rights. K.S.A. 22-3603 provides:

"**Interlocutory appeals by the state.** When a judge of the district court, prior to the commencement of trial of a criminal action, makes an order quashing a warrant or a search warrant, *suppressing evidence* or suppressing a confession or admission an appeal may be taken by the prosecution from such order if notice of appeal is filed within ten (10) days after entry of the order. Further proceedings in the trial court shall be stayed pending determination of the appeal." (Emphasis supplied.)

Defendant, in reliance on *State v. Boling,* 5 Kan. App. 2d 371, 617 P.2d 102 (1980), contends K.S.A. 22-3603 authorizes an interlocutory appeal by the State from orders of suppression only when the evidence is suppressed as having been obtained in violation of a defendant's constitutional rights. The Court of Appeals, in *Boling,* held the statute did not authorize interlocutory appeals by the State from rulings excluding evidence predicated upon statutory rules of evidence.

The State argues the Court of Appeals' construction of K.S.A. 22-3603, as expressed in *Boling,* is too narrow and the statute authorizes interlocutory appeals in any situation where the complained-of exclusion of evidence substantially impairs the State's ability to prosecute the case.

This precise issue has been decided in *State v. Newman,* 235 Kan. 29, 680 P.2d 257 (1984). In *Newman* this court stated:

"We have concluded that the narrow interpretation of the term 'suppressing evidence' in K.S.A. 22-3603 set forth in *Boling* should be rejected and should not be followed in this state. We hold that the term 'suppressing evidence' as used in that statute is to have a broader meaning than the suppression of evidence which is illegally obtained. It should include not only 'constitutional suppression' but also rulings of a trial court which exclude State's evidence so as to substantially impair the State's ability to prosecute the case." p. 34.

We conclude the State has made an adequate showing the complained-of exclusion of evidence substantially impairs the State's ability to prosecute the case. Accordingly, we further conclude the challenge to jurisdiction asserted in this issue is without merit.

In the second jurisdictional issue defendant contends the complained-of rulings excluding evidence were temporary rather than final orders and, hence, are not proper subjects for appellate review. By virtue of the nature of this issue, the relevant facts must be set forth in considerable detail.

After the mandate was received in *Galloway I,* the State filed a motion requesting: (1) all pending motions of defendant be set for hearing; and (2) the case be set for trial. One of defendant's motions sought suppression of the police investigation composite picture (Identi-Kit) of the alleged rapist.

On January 7, 1983, the district court set a trial date of February 7, 1983. On January 27, 1983, the State filed a motion raising an issue whether statements made by the defendant's wife to a police officer, concerning the wife's observation of the university keys at defendant's residence, were protected by marital privilege. On February 2, 1983, defendant filed a motion to suppress photographic lineup identification evidence and requested an order in limine excluding in-court identification testimony.

All motions then pending were called for hearing on February 4, 1983. The State had issued subpoenas for witnesses to be present on the various evidentiary issues. The witnesses were present. For some unexplained reason only legal arguments were heard at the February 4 hearing, and no witnesses were called to testify. At the conclusion of the hearing the district court reserved judgment on the defendant's motions to suppress the Identi-Kit photographs and the photographic lineup identification. Relative to the marital privilege issue, the district court indicated it saw no difficulty with defendant's wife testifying as to observation of the keys but, in essence, would defer any ruling thereon until defense counsel submitted some authority.

Sometime during the weekend of February 5/6, 1983, the district court notified all parties that, due to a snowstorm and resulting poor parking conditions at the Douglas County Courthouse, the trial would be continued for one week from Monday, February 7, to Monday, February 14, 1983.

On Tuesday, February 8, 1983, defendant filed a motion seeking his discharge because of an alleged violation of his statutory right to a speedy trial pursuant to K.S.A. 22-3402. Later that day the district court assembled the parties concerned and held a hearing on the speedy trial motion. The district court denied defendant's motion for discharge. Then, without prior notice to the State, the district court took up defendant's motions to suppress the police investigation composite photograph and photographic lineup identification, and the State's motion pertaining to the wife's observation of the university keys at the couple's residence.

During the February 8 hearing, the district court sustained defendant's motion to suppress the Identi-Kit photograph and the photographic lineup identification. Additionally, the district court held testimony of the wife's observation of the keys would be excluded on the basis of marital privilege. The specific language utilized by the district court is crucial to the determination of this issue and must be set forth in considerable detail.

In commencing the February 8, 1983, hearing, the district court complimented the defense attorney, Mr. Heeb, for his timely filing of the speedy trial motion as it made it possible for the court to have a hearing and the court wanted also to *"dispose* of some of the other matters in this case that I have now had time to reflect upon." (Emphasis supplied.) After denying defendant's speedy trial motion, the district court announced:

"Now the reason I'm glad you filed that and filed it promptly is because *I wanted to make some rulings in connection with some of these other matters that I have had time to research and reflect upon, and I would now enter the following orders: With regard to the Identi-Kit, the motion in limine will be granted* as to presentation of the Identi-Kit picture except as might be appropriate for rebuttal." (Emphasis supplied.)

The district court informed the parties the composite photograph (Identi-Kit) was "properly excluded as hearsay." The court then considered an issue involving K.S.A. 60-455 (other crimes or civil wrongs evidence), which is not an issue on appeal.

After addressing the K.S.A. 60-455 issue, the district court ruled on the State's motion relative to the propriety of the wife's testimony on her observation of the university keys at the marital residence, stating:

"THE COURT: Three: With regard to the privileged communication. Under 60-407 ordinarily the admissibility of all evidence is tested as to its relevance unless an exclusion—unless some exclusion or privilege keeps that evidence out. 60-428 excludes confidential communication. Six Washburn Law Journal 157, which counsel was nice enough to furnish me says that the rationale is protection of the marital harmony. I believe I already indicated that any statements made by the defendant to the wife would appear to be privileged communication, *and I now adopt that as the Court's ruling.* I think it is. And anything he said to her should be properly suppressed. Although there is not any authority which I have been able to put my finger on quickly as to her observation as to the keys, I can't see any difference between the spoken word and leaving the keys for the wife to see. Whether he says 'I got the keys' and says something about them, or leaves them there where the wife can see them is part and parcel of the same thing, and if the rationale is in fact to protect marital harmony then there is nothing to hide from the spouse, nothing to worry about her seeing because it seems to me *she should not be allowed to testify against him* in that regard either. *Therefore the motion in limine will be granted. There will be no statements made about the keys or seeing the keys on the part of the wife.* Here again I must note that if the defendant offers some explanation or gets into the subject there easily could arise the situation of a waiver, and we will have to watch carefully because even though *the order is in effect* there could be a waiver of the privilege by virtue of testimony by way of explanation." (Emphasis supplied.)

The district court then took up the defendant's motion to suppress the prosecutrix's pretrial photographic lineup identification of the defendant as her attacker. The battle on this issue had been fought in part on testimony by the prosecutrix at the *preliminary hearing* relative to her in-court identification of defendant wherein the following had occurred on direct examination:

"Q. Could you describe or give the description of what the person looked like?

"A. Well, he was—he just looked like a medium height man, medium weight, muscular, kind of trim, not fat and not thin. A real full round face was one thing that I noticed.

"Q. Okay. I'd like you to look around the courtroom and I'll ask you if the person that's in the courtroom that put you in the car that night at knifepoint.

"MR. HEEB: Objection, Your Honor, she stated that she never did see the individual and never saw the individual's face. There's no—there's no background or foundation to believe that she can make any kind of an identification.

"THE COURT: It's still a proper question. Objection is overruled.

"A. Well I never saw a good full front view, *but I do think it's him* (indicating).

"Q. Okay. You mean the person sitting over here in the gray-green overalls?

"A. Right.

"Q. Okay. Let the record reflect that the witness has identified the defendant. Why do you feel that it was him? What is it about him that makes you feel that way?

"A. Well, it looks like him. Like I told you that *if you put me in a room with fifty people I probably wouldn't be able to pick him out.*

"Q. Okay.

"A. Out of a crowd like that.

"Q. Okay.

"MR. HEEB: Your Honor, I move to strike that identification. It's obviously based on an in-court situation where there's a defendant sitting in jail garb and she picked him out and says he looks like the man, but she's—by her own admission couldn't pick the man out of a room of fifty people. That's improper identification and I move to strike that testimony.

"THE COURT: I think the identification is subject to cross-examination. It's a tentative identification and you can ask all those questions, but it's still a proper question and the response was proper. Objection is overruled." (Emphasis supplied.)

The district court in ruling on the suppression of the photographic lineup motion stated:

"Four: As to the in-court identification and photo lineup. I read again very carefully the quoted testimony from the transcript. It appears to me that the witness has said under oath that 'If you put me in a room with fifty people I couldn't pick him out'. Apparently she was shown a lineup or photographic lineup of six people knowing at the time that there was a man in custody, and I gather knowing that something of hers was found with this man. In other words the odds were changed from one to fifty, to one to six. The point I would make is if she can't pick one out of fifty it's not fair to make the odds one out of six in order to make an identification or to rehabilitate her testimony. She has apparently said, 'He looks like the man'. She could take the stand and she can say that. But you can't go any further with regard to the photographic lineup because she also made it clear although 'He looks like the man' she 'Couldn't pick him out of a room with fifty people in it'. So *the motion in limine on that item is granted.*

"MR. HEEB: I'm sorry. I didn't quite understand. *Is there to be no evidence concerning the photo lineup?*

"THE COURT: *That's right.* She can say on the stand he looks like the man, and I suspect on cross-examination she will be asked if she hadn't said, 'If you put him in a room with fifty people . . .' she couldn't pick him out. I don't expect the State would offer that, although they might. But the most you've got from this witness is that 'He looks like the man'. It's obvious to me the State's case is not based upon that identification other than 'He looks like the man', but it's clear the State does not have the defendant identified beyond a reasonable doubt visually. The State is using the property of the victim which were the keys

which were found in the defendant's house, and they're relying upon the sameness to another crime which may or may not be admissible after we conduct the Bly Hearing." (Emphasis supplied.)

It should be noted, for the sake of accuracy, it is undisputed that eight rather than six photos were involved in the photographic identification.

The district court concluded its activities in disposing of the various motions by declaring:

"I suspect that *we need not journalize those orders as long as you understand what they are because we have them clearly on the record, and I will have them in front of me here.*" (Emphasis supplied.)

The assistant district attorney representing the State advised the court she had not been told that motions other than the motion for dismissal would be taken up at the hearing. The court responded that it had not thought it would be able to take up the various pretrial motions until "during the trial," but the one-week postponement in the trial due to the snowstorm had given the court an opportunity to "research and reflect upon" the various motions. The district court continued:

"I wasn't trying to foreclose you, but having put the trial over for a week I have had the better part of the day to do the research and I'm happy I did because *now I do have time for what I was going to do.* If you have anything else that might affect the motion in limine *my order will stand* until you can show some reason why it shouldn't stand, and you have the rest of the week to do that." (Emphasis supplied.)

At the previous hearing, the State had argued the matter fully and had nothing further it could present on the issues. The State has advised the witnesses, if called, would not have added any new facts to alter the ruling as to the motion in limine.

The following day, February 9, 1983, the State filed a Notice of Interlocutory Appeal with the Douglas County District Court. The appeal was docketed with the Clerk of the Appellate Courts on Thursday, February 10, 1983. On the same day the appeal was filed, February 9, the State also filed two requests for transcripts. In its first request the State sought transcripts on the hearings held on February 4 and 8, 1983. In its second request the State sought transcripts on the preliminary hearing testimony of the prosecutrix and Detective Mike Hall.

In its interlocutory appeal, pursuant to K.S.A. 22-3603, the State seeks appellate review of the district court's orders ex-

cluding evidence of the police investigation composite photograph (Identi-Kit), the photographic lineup identification, and the testimony of defendant's wife pertaining to her observation of university keys at the couple's residence.

On Thursday, February 10, 1983, the trial judge learned of the State's interlocutory appeal through a radio news report. The court, on the same day, then directed both counsel to appear before it. The court made inquiry of the State as to whether it had, in fact, filed an interlocutory appeal. When the State responded in the affirmative, the court stated:

"Let me advise counsel that this case will be tried on Monday. *There will be no interlocutory appeal.* There has not yet even been a Jackson-Denno Hearing to appeal from. When I left the courtroom the other day you indicated to me you wanted to offer evidence and I told you I would hear it. If you get it in before trial, that is just fine. If you are not going to get it in until during the trial *my order on the motion in limine stands,* but *you're not going to the Supreme Court until you have a Jackson-Denno because you don't have a final order to appeal from."* (Emphasis supplied.)

Little would be gained by inclusion herein of a detailed recitation of what transpired during the balance of the February 10, 1983, conferences (there were two). It is obvious the district court was agitated over the State having filed a notice of interlocutory appeal and was confused regarding the nature of a *Jackson-Denno* proceeding. Further, the district court was operating on the belief the State could seek an appeal only on a question reserved pursuant to K.S.A. 22-3602(*b*)(3). Additionally, on February 10, 1983, the district court made statements to the effect its rulings entered two days previously were temporary, rather than final orders. Moreover, representations were made by the district court it could just cancel its previous orders. Without dwelling further on the February 10, 1983, conferences, we can understand why the State felt it had no alternative but to proceed with its pending interlocutory appeal. We also note the district court's proceedings on February 10, 1983, are apparently contrary to K.S.A. 22-3603 which explicitly provides further proceedings in the trial court shall be stayed pending determination of an interlocutory appeal. See also Supreme Court Rule 4.02(e), 232 Kan. cviii.

In dismissing the State's appeal in this case because there were allegedly no final orders to appeal from, the Court of Appeals emphasized the oral orders of February 8, 1983, had not

been journalized. In *State v. Bohannon*, 3 Kan. App. 2d 448, 596 P.2d 190 (1979), the Court of Appeals stated:

"Oral orders which are appealable must, when entered, be on the record, and should expressly state whether the announcement alone is intended to constitute entry of the order or whether the trial court expects the order to be journalized and approved by the court before it is deemed to have been formally 'entered.'" 3 Kan. App. 2d 448, Syl. ¶ 1.

The two elements of *Bohannon* have been met in this case. First, the orders of suppression appeared on the record—a transcript was made of the February 8, 1983, hearing. Second, the district court advised the parties there was no need to journalize the orders as long as the litigants understood "what they are because we have them clearly on the record, and I will have them in front of me here."

It is clear from the record of the proceedings on February 8, 1983, the three rulings relative to exclusion of evidence: (1) were final orders; (2) substantially impaired the State's ability to prosecute the case (as previously held); and (3) are proper subjects for an interlocutory appeal by the State pursuant to K.S.A. 22-3603.

Having disposed of the jurisdictional issues, we shall consider the substantive questions presented in this appeal.

II. DID THE DISTRICT COURT ERR IN SUPPRESSING A COMPOSITE (IDENTI-KIT) OF DEFENDANT PREPARED BY A POLICE OFFICER AT THE DIRECTION OF THE PROSECUTRIX?

The alleged attack upon Ms. G. occurred on May 12, 1981. The following day she was interviewed by Detective Donoho of the Lawrence Police Department for the purpose of assembling a composite (Identi-Kit) likeness of her assailant.

The procedure utilized in assembling the composite was described in detail by Ms. G in her testimony at the preliminary hearing held herein. The Identi-Kit consisted of many transparent overlays each depicting a different facial characteristic or hair style. Detective Donoho initially presented Ms. G with a composite which the prosecutrix characterized as a "Joe Average" portrait. Ms. G was then asked what was wrong with it and overlays were added or deleted in accordance with her series of responses. This procedure took from fifteen to thirty minutes. A photograph was taken of the end product and has

been designated State's Exhibit No. 9. Ms. G identified Exhibit No. 9 as accurately depicting the final Identi-Kit composite. Illustrative of Ms. G's testimony relative to the construction of the composite is the following excerpt from defense counsel's recross-examination of Ms. G at the preliminary hearing:

"Q. Did he get the face as round as you would have had it if you could have free hand drawn it?

"A. What I told him to do finally was to sketch it down to make it so the chin wasn't so pointed to get a shorter type looking face.

"Q. Was there anything else you tried to get him to do to change the drawing that he was unable to do with the materials that he had?

"A. No. I didn't ask for anything else. I couldn't remember it specifically enough to—I would say it just kind of looks wrong, looks right.

"Q. So the eyes then for instance are the closest representation that you could construct according to the materials that were available and the fact that you didn't see your assailant's face, is that correct?

"MR. HAMMEL [Assistant District Attorney]: Judge, I'm going to object to that. I don't believe she ever stated she didn't see her assailant's face. That's not in evidence.

"MR. HEEB: I think that is in evidence, Your Honor.

"THE COURT: I think it's a misstatement of facts. Objection is sustained.

"Q. (By Mr. Heeb) Concerning their observations that you did have of your assailant and the available choices of eyes, overlays, that is the closest that you could come up with, is that correct?

"A. Yeah, I think so.

"Q. Is the same true for the nose?

"A. Yeah, we didn't play with the nose too much.

"Q. Okay. And the mouth, is that true?

"A. Right.

"Q. But the shape of the face is not the way you would have had it, it's a modification based on materials that were available, is that correct?

"A. Yeah, I think so."

The defendant's motion to suppress the photograph of the composite contended:

"2. That the composite picture was not based on a description by the complaining witness; rather, Detective Donoho constructed a face and then modified it through replacement of various facial features which he chose in response to Ms. [G's] comments.

"3. That Ms. [G] testified at the preliminary hearing that the [Identi-Kit] composite did not accurately depict her recollection of her alleged assailant.

"4. That the composite picture produced by Detective Donoho is hearsay evidence and inadmissible; it was assembled by Detective Donoho based not on what he saw but on what was told to him by someone else; the composite picture has no standing as to the truth or accuracy of the matter contained in it."

In sustaining defendant's motion to suppress the photograph of the composite, the district court stated:

"With regard to the Identi-Kit, the motion in limine will be granted as to presentation of the Identi-Kit picture except as might be appropriate for rebuttal. I suspect that is the way it was going to happen anyway, but I am satisfied after reading [42] ALR 3d 1217 that such an exhibit is properly excluded as hearsay in that it relies upon the operator's skill as well as what the victim says, and I repeat, it's not excluded as it might be appropriate for rebuttal."

See Annot., Admissibility in Evidence of Composite Picture or Sketch Produced by Police to Identify Offender, 42 A.L.R.3d 1217.

In *State v. Childs,* 198 Kan. 4, 422 P.2d 898 (1967), the defendant was convicted of two counts of first-degree robbery. The victims of the robberies were able to identify defendant in a police photographic lineup. In affirming the conviction, this court stated:

"This court has held the testimony of a witness as to the identity of an accused is admissible if based upon the accused's voice, features, or other distinguishing characteristics *(State v. Hill,* 193 Kan. 512, 394 P.2d 106; *State v. Nixon,* 111 Kan. 601, 207 Pac. 854; *State v. Herbert,* 63 Kan. 516, 66 Pac. 235), including the extrajudicial identification of an accused in a police lineup *(Peterson v. State,* 198 Kan. 26, 422 P.2d 567; *State v. Hill,* supra).

"Although the courts are somewhat divided as to the competency of evidence of extrajudicial identification, there is respectable authority holding that *prior identification of an accused may be shown by the testimony of the identifying witness in corroboration of the testimony of the same witness identifying the accused at the trial.* (20 Am. Jur., Evidence § 353; 22A C.J.S., Criminal Law § 725; Anno. 71 A.L.R.2d 449; 1 Wharton, Criminal Evidence §§ 181, 182 [12th ed. 1955]; 4 Wigmore, Evidence § 1130 [3d ed. 1940].) The rationale of many of the cases appears to be that evidence of former identification made under proper circumstances is impressed with such trustworthiness as to entitle it to consideration by the jury (*e.g., People v. Hurley,* 151 Cal. App. 2d 339, 311 P.2d 49; *Basoff v. State,* 208 Md. 643, 119 A.2d 917)." 198 Kan. at 9-10 (Emphasis supplied.)

Continuing:

"We think the reasoning adopted by the authorities favoring the admission into evidence of the extrajudicial identification of an accused is sound and should be applied where, as in the instant case, prior identification is made from photographs." 198 Kan. at 10.

Different jurisdictions have varying views on the nature and admissibility of composite identification. *People v. Rogers,* 81 Ill. 2d 571, 411 N.E.2d 223 (1980), which cites *State v. Childs,* 198 Kan. 4, contains an in-depth analysis of this area of the law.

In *Rogers* defendant was convicted of armed robbery. At trial a photocopy of a composite (Identi-Kit) photograph was admitted into evidence to corroborate the identification testimony given by the prosecuting witness. On appeal the Illinois Court of Appeals reversed defendant's conviction upon the ground it was error for the trial court to have admitted the composite into evidence. *People v. Rogers,* 75 Ill. App. 3d 866, 394 N.E.2d 813 (1979). The Illinois Supreme Court granted the State leave to appeal, pursuant to Rule 315, 73 Ill. 2d 475, and reversed the ruling of the Illinois Court of Appeals, reinstating the defendant's conviction.

As in the instant action, the victim of the crime assisted the police in making a composite image of his assailant. The victim also identified the defendant in a photographic lineup. At trial the State introduced a photocopy of the composite created and the defendant objected thereto. The complaining witness admitted, as here, he was not in total agreement with the sketch. 81 Ill. 2d at 573-74. The police officer who assembled the composite testified to the description provided by the witness and the procedures employed in assembling the composite. 81 Ill. 2d at 574.

In reinstating defendant's conviction, the Illinois Supreme Court rejected the thesis that composite photographs were hearsay and therefore inadmissible, stating:

"An Identi-kit consists of several transparent overlays. On each overlay is a printed variation of a facial feature. The eyewitness selects the variation of each feature which most closely matches that of the offender. Since each overlay is numbered, the composite can be easily duplicated. (See Annot., 42 A.L.R.3d 1217, 1220 (1972).) The Identi-kit composite is an extrajudicial identification; that is, it is an identification made prior to or outside of the trial in which the evidence of the identification is sought to be introduced. (Annot. 71 A.L.R.2d 449, 452 (1960); Note, *Admissibility of Extrajudicial Identifications,* 32 Okla. L. Rev. 462, 462-63 (1979).) The admissibility of such evidence may be challenged on two grounds. First, it may be alleged that the surrounding circumstances under which the identification was obtained were unnecessarily suggestive. Then, on constitutional grounds, the extrajudicial identification evidence will be barred from use at trial. (See, *e.g., Gilbert v. California* (1967), 388 U.S. 263, 18 L.Ed.2d 1178, 87 S.Ct. 1951 (in-court identification must be free from taint of illegal lineup).) It is the second ground, concerning evidentiary rules, upon which the defendant claims that the trial court erred in admitting the Identi-kit composite sketch in our case. Citing *People v. Turner* (1968), 91 Ill. App. 2d 436, and *People v. Fair* (1977), 45 Ill. App. 3d 301, defendant asserts that the identification constituted impermissible hearsay. He also argues that the com-

posite, admitted through the testimony of the prosecuting witness, was no more than a prior consistent statement which cannot be introduced to bolster the witness' testimony in the absence of impeachment. The State also premises its argument first on hearsay principles, stating that the extrajudicial identification should be admissible as substantive evidence of prior identification since the declarant was available for cross-examination at trial and the identity of the defendant was a critical issue in dispute. The State also asserts that the prohibition against the admission of prior consistent statements is inapplicable in situations where identification evidence is involved.

"Several jurisdictions have addressed the issue concerning the propriety of permitting evidence of an extrajudicial identification in a trial where the identity of the accused is an issue. Some courts have allowed the prior identification to be admitted as corroboration testimony, stating that the evidence relates to the weight and sufficiency of the in-court identification rather than to its admissibility. (*State v. Childs* (1967), 198 Kan. 4, 422 P.2d 898 (photograph identification); *Judy v. State* (1958), 218 Md. 168, 146 A.2d 29 (photograph).) Other courts hold the extrajudicial identification to be admissible as independent substantive evidence of identity. (*People v. Gould* (1960), 54 Cal. 2d 621, 254 P.2d 865, 7 Cal. Rptr. 273 (photograph identification).) Another court has ruled that although the Identi-kit composite itself was inadmissible, the preparing police officer could testify as to the operation of the Identi-kit. (Butler v. State (1970), 226 Ga. 56, 172 S.E.2d 399.) Other jurisdictions have held, pursuant to statute, that evidence of prior identification is permissible as either corroboration of impeached identification testimony (*State v. Lancaster* (1971), 25 Ohio St. 2d 83, 267 N.E.2d 291 (police artist sketch)) or as substantive proof of identity where the identifier is subject to cross-examination and the evidence is fair and reliable (*State v. Ginardi* (1970), 111 N.J. Super. 435, 268 A.2d 534 (Identi-kit composite sketch)). For a list of States which have adopted evidence rules providing for the admissibility of prior identifications, see 11 Moore's Federal Practice, section 801.41 [4.-2], at VIII-40 (2d ed. 1976). On the other hand, several jurisdictions have held evidence of prior identification to be inadmissible hearsay and have refused its admission in evidence unless the evidence falls within an exception to the hearsay rule. See, *e.g., People v. Coffey* (1962), 11 N.Y.2d 142, 182 N.E.2d 92, 227 N.Y.S.2d 412 (police artist sketch); *Commonwealth v. Rothlisberger* (1962), 197 Pa. Super. 451, 178 A.2d 853 (artist sketch); *Commonwealth v. McKenna* (1969), 355 Mass. 313, 244 N.E.2d 560.

"From these cases it is apparent that the courts generally consider sketches and Identi-kit composites as out-of-court identifications and the use of them to be governed by the rules applicable to the admission of evidence concerning out-of-court identifications. The applications of these rules in the cases usually involve a discussion of the hearsay rule.

"It appears that no single facet of the law has been productive of as much confusion as has the application of the hearsay evidence rule. The varied treatment given evidence of pretrial identification in the cases discussed amply demonstrates this assertion. The definition of hearsay itself is deceptively simple and is generally accepted to be testimony of an out-of-court statement offered to establish the truth of the matter asserted therein, and resting for its value upon the credibility of the out-of-court asserter. (*People v. Carpenter* (1963), 28 Ill. 2d

116, 121; McCormick, Evidence sec. 246, at 584 (2d ed. 1972).) The confusion arises, as is often the case, in the application of the definition. Often, a broad, sweeping generalization is made in the reported decisions and by attorneys that all extrajudicial statements made out of the presence of a defendant are hearsay and therefore not admissible. However, in many situations, testimony may be offered of an out-of-court assertion to prove the facts of the matter asserted, and yet the reason for the exclusion of hearsay evidence will be absent. We find the facts now before us to constitute such a situation.

"The reason for excluding such evidence is found in the last phrase of the definition stated above: '[A]nd resting for its value upon the credibility of the out-of-court asserter.' The basis for excluding evidence under the hearsay rule lies in the fact that an opportunity to ascertain the veracity of the testimony is absent (29 Am. Jur. 2d, *Evidence* sec. 493, at 552 (1967)), and not that the evidence offered may technically fall within the definition of the term. Thus, the essential requirement of the testimonial offering is the opportunity for cross-examination of the party whose assertions are offered to prove the truth of the fact asserted. *People v. Robinson* (1978), 73 Ill. 2d 192, 200; *People v. Clark* (1972), 52 Ill. 2d 374, 389; *People v. Cook* (1965), 33 Ill. 2d 363, 370; *People v. Carpenter* (1963), 28 Ill. 2d 116, 121.

"This court, in the past, has approved the giving of testimony that the victim of a crime has identified the defendant from a photograph or from a lineup. (*People v. Cook* (1965), 33 Ill. 2d 363, 371; *People v. Miller* (1963), 27 Ill. 2d 336; *People v. Gray* (1962), 24 Ill. 2d 229; *People v. Brown* (1959), 16 Ill. 2d 482.) Although in these cases the witness was permitted to testify as to his out-of-court identification as corroboration of his in-court identification, this accepted evidence of out-of-court statements was in no case admitted as substantive evidence, even though the one who made the statements is present in court and subject to cross-examination. See *People v. Spicer* (1979), 79 Ill. 2d 173, 179; *People v. Bailey* (1975), 60 Ill. 2d 37, 43; *People v. Cook* (1965), 33 Ill. 2d 363, 371; *People v. Moretti* (1928), 330 Ill. 422, 424; *People v. Scott* (1921), 296 Ill. 268, 273.

"In *People v. Clark* (1972), 52 Ill. 2d 374, 388-90, this court noted the general rule that although the witness may be present in court and subject to cross-examination, he may not testify as to statements he made out of court for the purpose of corroborating his testimony given at trial relative to the same subject, except to rebut a charge or inference that the witness is motivated to testify falsely or that his testimony is of recent fabrication. This general rule does not, however, apply to statements of identification. The justification for this exception is based on the notion that, by the time of trial, the witness' mind has become so conditioned that there is little likelihood that he would not identify the person in court. The exception has been explained thus:

" 'The psychology of the situation is practically the same as when recent contrivance is alleged. To corroborate the witness, therefore, it is entirely proper *** to prove that *at a former time,* when the suggestions of others could not have intervened to create a fancied recognition in the witness' mind, he recognized and declared the present accused to be the person.' (Emphasis in original.) (4 Wigmore, Evidence sec. 1130, at 277 (Chadbourn rev. ed. 1972).)

Although this exception in favor of identification testimony is widely acknowledged, it has not been applied by the courts in a uniform manner. See Annot., 71 A.L.R.2d 449 (1957).

"To resolve the uncertainty as to the law in this State concerning evidence of out-of-court identification, we set forth herein the rules that should govern the admissibility of such evidence. If a third person were to testify that he saw or heard A identify B as the person who committed the offense, that would obviously and clearly be hearsay testimony and would not be admissible. However, if A testifies that he previously identified B and his veracity is tested by cross-examination, the reason for excluding the third person's testimony has been removed. The third person should then be permitted to testify that he heard or saw A identify B because both A and the third person would be subject to cross-examination concerning the out-of-court identification. Evidence of such out-of-court identification by both A and the third person should be admissible but should be used only in corroboration of in-court identifications and not as substantive evidence. Before the third person is permitted to testify as to A's identification of B, A should first testify as to his out-of-court identification.

"In this case, Moake testified, under oath, as to his statement concerning the description of the robber which he gave to Detective Ashman. Moake also testified as to the authenticity of the photocopy of the Identi-kit composite sketch. The jury was able to observe Moake's demeanor, and, more importantly, Moake was subject to cross-examination and was, in fact, cross-examined. Under these facts alone, we would hold that the admission of the sketch did not constitute error. The additional fact that Detective Ashman testified at the trial supports our decision; the officer's testimony served to authenticate the photocopy and to establish the veracity of Moake's testimony. We therefore hold that the hearsay rule does not operate to bar the admission of the extrajudicial identification.

"As hereinbefore stated, the composite and testimony concerning the production thereof constituted extrajudicial statements of identification. We have long permitted the admission of authenticated prior identification evidence where the identifier is present at trial and available for cross-examination. (See, e.g., People v. Wilson (1953), 1 Ill. 2d 178, 188-89, cert. denied (1954), 347 U.S. 928, 98 L.Ed. 1080, 74 S.Ct. 530; see generally McCormick, Evidence sec. 251, at 603 (2d ed. 1972); Comment, Hearsay Witnesses' Prior Statements, and Criminal Justice in Illinois, 1974 U. Ill. L.F. 675 (1974).) In People v. Cook (1965), 33 Ill. 2d 363, 371, we recognized the significance of identification evidence:

" 'We have consistently approved and regarded as convincing evidence the fact that the victim of a crime has identified the defendant from a photograph or a police line-up.'
We find equally convincing the evidence of a description given to the police shortly after the commission of the crime and the sketch produced therefrom.

"We therefore hold that the trial court did not err in its admission in evidence of the composite sketch. The identification evidence did not constitute impermissible hearsay evidence; the identifying witness Moake testified under oath and was subject to cross-examination as to his out-of-court statements. Furthermore, the evidence was not admitted as substantive evidence but as prior identification evidence to corroborate the prosecuting witness' in-court identification of the defendant. As such, it was properly admitted. We reject defendant's assertion that the discrepancies in the physical description Moake gave to the

police shortly after the crime rendered the sketch unreliable. These matters did not concern the admissibility of the evidence, but, rather, concerned the credibility of Moake and the weight to be given the identification evidence." 81 Ill. 2d at 574-81.

We believe the rationale of the Illinois Supreme Court expressed in *People v. Rogers,* 81 Ill. 2d 571, is sound and it is consistent with our holding in *State v. Childs,* 198 Kan. 4.

The composite was made at the direction of Ms. G and she fully identified the photograph as an accurate depiction of the completed Identi-Kit composite. There was nothing so unduly suggestive relative to the creation of the Identi-Kit composite, as to require its suppression on constitutional grounds.

As for the evidentiary grounds on which exclusion is sought herein, an Identi-Kit composite is not inadmissible hearsay. Rather than substantive evidence, it is prior identification evidence introduced to corroborate the witness' in-court identification of the accused. The means or manner in which the extrajudicial identification is made relates to the weight and sufficiency of the evidence rather than its admissibility. Following *People v. Rogers,* 81 Ill. 2d 571; *State v. Childs,* 198 Kan. 4.

We conclude the district court erred in excluding the photograph of the Identi-Kit composite.

III.  DID THE DISTRICT COURT ERR IN GRANTING DEFENDANT'S MOTION TO SUPPRESS THE ALLEGED VICTIM'S PRETRIAL PHOTOGRAPHIC LINEUP IDENTIFICATION BECAUSE THE PROCEDURES EMPLOYED BY THE POLICE IN THE LINEUP WERE SO IMPERMISSIBLY SUGGESTIVE AS TO GIVE RISE TO A VERY SUBSTANTIAL LIKELIHOOD OF IRREPARABLE MISIDENTIFICATION?

On July 16, 1981, slightly more than two months after the alleged rape and sodomy, Ms. G went to the Douglas County Judicial and Law Enforcement Center to view a photographic lineup. The photographs were of eight black males who were quite similar in appearance. In fact, when first shown the photographs Ms. G commented to the effect, "You're not making it easy." After several minutes of studying the photographs, Ms. G picked out defendant's photograph and said she thought that man was her attacker, but she was not one hundred percent sure.

Ms. G apparently knew there was a man in custody on a rape charge who had the missing keys.

At the preliminary hearing held in late July, 1981, Ms. G was asked, on direct examination by the State, about the attack upon her and then asked if she could identify her attacker. Although what transpired is set forth earlier in this opinion, we repeat the following excerpt from the preliminary hearing transcript for convenience:

"Q. Could you describe or give the description of what the person looked like?

"A. Well, he was—he just looked like a medium height man, medium weight, muscular, kind of trim, not fat and not thin. A real full round face was one thing that I noticed.

"Q. Okay. I'd like you to look around the courtroom and I'll ask you if the person that's in the courtroom that put you in the car that night at knifepoint.

"MR. HEEB: Objection, Your Honor, she stated that she never did see the individual and never saw the individual's face. There's no—there's no background or foundation to believe that she can make any kind of an identification.

"THE COURT: It's still a proper question. Objection is overruled.

"A. Well I never saw a good full front view, *but I do think it's him* (indicating).

"Q. Okay. You mean the person sitting over here in the gray-green overalls?

"A. Right.

"Q. Okay. Let the record reflect that the witness has identified the defendant. Why do you feel that it was him? What is it about him that makes you feel that way?

"A. Well, it looks like him. Like I told you that *if you put me in a room with fifty people I probably wouldn't be able to pick him out.*

"Q. Okay.

"A. Out of a crowd like that.

"Q. Okay.

"MR. HEEB: Your Honor, I move to strike that identification. It's obviously based on an in-court situation where there's a defendant sitting in jail garb and she picked him out and says he looks like the man, but she's—by her own admission couldn't pick the man out of a room of fifty people. That's improper identification and I move to strike that testimony.

"THE COURT: I think the identification is subject to cross-examination. It's a tentative identification and you can ask all those questions, but it's still a proper question and the response was proper. Objection is overruled." (Emphasis supplied.)

On cross-examination defense counsel inquired of Ms. G as follows:

"Q. You've testified that you would not be able to identify your assailant in a room of fifty people, is that correct?

"A. Yeah—well, I doubt that I would be able to."

A year and a half after the preliminary hearing, more than three months after this court's opinion in *Galloway I,* 232 Kan. 87, and less than one week before trial was scheduled to commence, defendant filed a motion to suppress the State's photographic lineup evidence on the basis it was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. In granting the motion, the district court stated:

"As to the in-court identification and photo lineup. I read again very carefully the quoted testimony from the transcript. It appears to me that the witness has said under oath that 'If you put me in a room with fifty people I couldn't pick him out'. Apparently she was shown a lineup or photographic lineup of six people knowing at the time that there was a man in custody, and I gather knowing that something of hers was found with this man. In other words the odds were changed from one to fifty, to one to six. The point I would make is if she can't pick one out of fifty it's not fair to make the odds one out of six in order to make an identification or to rehabilitate her testimony. She has apparently said, 'He looks like the man'. She could take the stand and she can say that. But you can't go any further with regard to the photographic lineup because she also made it clear although 'He looks like the man' she 'Couldn't pick him out of a room with fifty people in it'. So the motion in limine on that item is granted.

"MR. HEEB: I'm sorry. I didn't quite understand. *Is there to be no evidence concerning the photo lineup?*

"THE COURT: *That's right.*" (Emphasis supplied.)

The issue before the trial court was whether the photographic lineup was impermissibly suggestive. It is difficult to see how the witness' statement relative to her difficulty with in-court identification occurring at the subsequent preliminary hearing has any relevance to the issue.

In Kansas a pretrial identification of a defendant by use of photographs will be suppressed only if the identification procedure is so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *State v. Chiles,* 226 Kan. 140, 143-44, 595 P.2d 1130 (1979); *State v. Wilson,* 221 Kan. 92, 95, 558 P.2d 141 (1976); *State v. Mitchell,* 220 Kan. 700, 556 P.2d 874 (1976); *State v. Nesmith,* 220 Kan. 146, 551 P.2d 896 (1976).

On cross-examination at preliminary hearing, Ms. G testified relative to the photographic lineup as follows:

"Q. At the time of the picture line-up had you been told by any police officers that items believed to have belonged to you, had been recovered?

"A. No, I didn't—

"Q. Were you told that the police had a suspect in the case?

"A. Not in this case. For the other rape incident they said that there was one, a suspect in custody for that.

"Q. Okay. What did the officer say to you about that other case and how it related to your case?

"A. That they found the keys, that they traced them back to me after having caught a man for the other rape and that's how I was connected with it.

"Q. *Did they suggest to you that the suspect's picture was among those pictures shown to you in the picture line-up?*

"A. I guess *they never said that.* I assumed it would be, but *they never told me.*

"Q. What officer told you about the suspect and the keys in the other case?

"A. Mike Hall, only after I asked him.

"Q. Only after you asked him?

"A. Yeah.

"Q. Okay. And *it's your testimony on direct examination that you were told to look at these pictures and make your best guess as to which picture was of the individual who attacked you, is that your testimony?*

"A. *Well, the way he put it was look at the pictures and see if you can identify the man who attacked you and if you're not sure, if you can't remember, that's fine. If you can pick him out for sure that's fine.*" (Emphasis supplied.)

The police officer present at the photographic lineup, Detective Mike Hall, corroborated Ms. G's testimony relative to the photographic identification.

In *State v. Ponds*, 227 Kan. 627, 608 P.2d 946 (1980), this court, in affirming a conviction for aggravated robbery, was confronted with an allegation of suggestive, pretrial photographic identification. In *Ponds* the detective in charge of the investigation phoned the victim and informed her the police had arrested the man they believed to be the robber. 227 Kan. at 628. The detective then went to the victim's home and showed seven photographs to the prosecutrix. Two of the photographs were of the defendant, one recent and the other seven years old. The detective, in presenting the photographs asked: "Which one of these men is the one that robbed you? Can you identify any of them as being the one that robbed *you*?" 227 Kan. at 628. On appeal defendant contended the trial court erred in refusing to suppress the prosecutrix's photographic and subsequent courtroom identification. The trial court ruled the photographic lineup identification was admissible and refused to suppress any future in-court identification. 227 Kan. at 629. The trial court did suppress the prosecutrix's preliminary hearing identification on other grounds. 227 Kan. at 629. Defendant argued the police

procedures, especially the comments of the detective, rendered the photographic identification so impermissibly suggestive as to create a substantial likelihood of misidentification. 227 Kan. at 628. In rejecting defendant's appeal this court held:

"We have recognized the potential for impermissibly suggestive pretrial identifications. In each case, the totality of circumstances is analyzed to determine whether an identification is so impermissibly suggestive that it gives rise to a very substantial likelihood of irreparable misidentification. See *State v. Baker,* 227 Kan. 377, 607 P.2d 61 (1980); *State v. Reed,* 226 Kan. 519, 601 P.2d 1125 (1979); *State v. Nesmith,* 220 Kan. 146, 551 P.2d 896 (1976)." 227 Kan. at 629.

Additionally, the court found no merit in defendant's contention the photographic lineup was rendered impermissibly suggestive by the detective's comment the police had a person in custody who they believed had robbed the victim.

"There is nothing unusual or suggestive in a statement that the police have arrested a suspect or in the request to pick 'the one that robbed you.' Detective Brown's confirmation that Ms. Winters' choice was also the police suspect was not suggestive since it followed the photo identification." 227 Kan. at 630.

We conclude there was no competent evidence presented upon which the district court could have determined the photographic identification was so impermissibly suggestive as to give rise to a substantial likelihood of irreparable misidentification. The order of the district court excluding evidence of the photographic lineup is reversed.

IV. DID THE DISTRICT COURT ERR IN EXCLUDING EVIDENCE OF OBSERVATION BY DEFENDANT'S WIFE OF THE KEYS ON THE BASIS OF MARITAL PRIVILEGE?

K.S.A. 60-423(*b*) provides:

"(*b*) An accused in a criminal action has a privilege to prevent his or her spouse from testifying in such action with respect to any *confidential communication* had or made between them while they were husband and wife, excepting only (1) in an action in which the accused is charged with (i) a crime involving the marriage relation, or (ii) a crime against the person or property of the other spouse or the child of either spouse, or (iii) a desertion of the other spouse or a child of either spouse, or (2) as to the communication, in an action in which the accused offers evidence of a communication between himself or herself and his or her spouse." (Emphasis supplied.)

K.S.A. 60-428(*a*) provides:

"(*a*) *General rule.* Subject to K.S.A. 60-437 and except as otherwise provided in subsections (*b*) and (*c*) of this section, *a spouse who transmitted to the other the*

*information which constitutes the communication,* has a privilege during the marital relationship which he or she may claim whether or not a party to the action, to refuse to disclose and to prevent the other from disclosing communications found by the judge to have been had or made in confidence between them while husband and wife. The other spouse or either his or her guardian or conservator may claim the privilege on behalf of the spouse having the privilege." (Emphasis supplied.)

On January 27, 1983, the State filed a motion with the district court in which the State sought permission to inquire of defendant's wife relative to her observation of certain University of Kansas keys recovered at defendant's residence by Detective Hall while executing a search warrant issued in connection with another crime. During the police investigation, Mrs. Galloway ·purportedly made a comment to Detective Hall concerning her observance of the keys at defendant's residence. Allegedly she had observed the keys over a two to three month period following the alleged rape and sodomy of the prosecutrix. Detective Hall had found the keys in the back of a nightstand drawer which was full of other material. The nightstand was located in a bedroom at the marital residence.

The district court held that no evidence could be introduced relative to the wife's observation of the keys, based on marital privilege.

Marital privilege is thoroughly discussed in *State v. Newman,* 235 Kan. 29, 680 P.2d 257 (1984). In *Newman* we held:

"The statutory marital privilege between husband and wife does not extend to all observations of the acts of one spouse by the other. The marital privilege is limited to spoken or written statements or nonverbal signs or gestures seeking to transmit information from one spouse to another." Syl. ¶ 3.

The wife's alleged observation of the keys in the back of a crowded drawer lacks any indicia of a communication. The location of the keys would support an inference of intended concealment and at least establish no intention to transmit or repose confidential information in the wife. The observation alleged herein is clearly outside the ambit of marital privilege.

For the reasons set forth above, the judgment of the Court of Appeals dismissing the appeal is reversed. The judgment of the district court excluding evidence is reversed and the case is remanded for further proceedings.